# Russell *versus* Miller.

1. Williams owned the lease of a colliery and assigned it to Russell as security for debts ; Russell afterwards assigned his interest to Miller for debts and future liabilities to Miller ; and by arrangement Miller afterwards took possession of the colliery ; Williams' interest was then sold by the sheriff to Miller, who afterwards loaned money on notes to Russell for the personal accommodation of Russell, to meet liabilities incurred by Russell for Williams. In a suit on the notes, the court below charged that these loans were outside of the pledge. *Held,* not to be error.

2. If Miller had been holding the colliery as security for these loans, its profits would go to their extinguishment, otherwise, they would have no connection with them, but the profits would stand as an independent claim, to be accounted for to Russell under his assignment to Miller.

3. There was, therefore, no equitable defence to the loan, because the profits were not pledged to its payment.

[Russell *v.* Miller.]

4. That which can be set off as an independent counter claim, must be such as a jury can find and liquidate in the ordinary way, just as if the defendant were plaintiff suing in action of debt, &c.

5. When the right of the defendant is only to call the plaintiff to an account, and his demand is such as must be settled in account render or by bill in equity, it is not a proper set-off.

6. Set-off to set-off cannot be permitted; and an unadjusted question of account and profits from a long and complicated business, to be found in numerous books of account, cannot be tried by a jury at bar.

January 23d and 24th 1867.   Before WOODWARD, C. J., THOMPSON, READ and AGNEW, JJ.   STRONG, J., at Nisi Prius.

Error to the Court of Common Pleas of *Schuylkill county.*

This was an amicable action of assumpsit to June Term 1857, between Charles Miller and Joseph Patterson, trading as Charles Miller & Co., plaintiffs, and Thomas M. Russell and others, executors, &c., of Andrew Russell, deceased, defendants.

The suit was upon two notes from Russell to Miller & Co.; one dated March 1st 1852, at four months, for $3000; the other dated March 25th 1852, at four months, for $1673.07.  The pleas were non assumpsit, and payment with leave, &c., and set-off.

On the 1st of January 1846, the assignees of the Bank of United States and E. H. Kimball leased to Thomas C. Williams a tract of coal-land in Schuylkill county, known as the Mount Laffee tract, for ten years, for a rent of 31 cents per ton of the coal mined at the end of every month.   On the 31st of August, in the same year, Williams assigned this lease to Andrew Russell, as collateral security for a bond of $6250, payable to Russell on the 1st of July 1847, and for any other money Russell should lend to him, or become liable to pay for him.   Williams, on the 24th of December 1847, acknowledged in writing that his liabilities to Russell, for which the lease was security, amounted to $53.150.

On the 27th of the same month Russell assigned the lease to the plaintiffs as " collateral security for the payment of certain notes of different dates, amounting to the sum of $23,150, and for and as a collateral security for any other sum of money that the said Charles Miller & Co. may lend to the said Andrew Russell, or any other liabilities they may incur for him, and the payment thereof, and for all renewals of the same with interest thereon, until the whole be fully paid by the said Andrew Russell."   Russell, at the same time, assigned to Miller & Co. certain bonds amounting to $25,000, and a mortgage accompanying them, as additional security for the same liabilities, Miller & Co. agreeing that, upon the payment by Russell of $9000, they would reassign the lease, and on the payment of $14,150, and any other liabilities incurred by them, they would reassign the bonds and mortgage.   Russell, at the same date, receipted to Miller & Co. for their acceptances of his drafts for $13,000, to be negotiated to reimburse money advanced to him, it being understood that these acceptances were

[*Russell v. Miller.*]

"not additional to the $23,500." Williams endorsed on the receipt, December 28th: "As the within arrangement was made by A. Russell for my accommodation and benefit, I hereby agree to pay him whatever amount he has to pay C. Miller & Co. for negotiating said paper."

On the 3d of March 1848, Miller & Co. and Williams, with the assent of Russell, agreed that Williams should consign to Miller & Co. all his coal, except from one slope, Miller & Co. to retain 50 cents per ton toward Williams's liabilities to them; the bonds, mortgage and lease assigned to them by Russell to be retained by them until all their liabilities for Williams and Russell should be paid in full; Miller & Co. to advance to Williams and Russell their paper to an amount not exceeding $23,500, to be renewed from time to time by Williams and Russell, they to pay all interest, expenses, &c., of the renewals, and Miller & Co. to receive 30 cents per ton for selling the coal.

On the 15th of June 1848, Miller & Co. lent Williams $3500, and on the same day he assigned to them all his interest in the lease, together with fixtures, tools, &c., until the $3500, and all other indebtedness of Williams to them, and also the indebtedness of Russell, mentioned in his assignment, should be discharged; "the object of this agreement being to secure to the said Joseph Patterson and Charles Miller, as perfectly as can be done, the payment of all money due, or that may hereafter become due to them, from the said Thomas Williams."

By a statement of Russell to Miller & Co., under date of December 30th 1847, showing what made up Williams's indebtedness of $53,150, it appeared that there were included in it two notes to Safford & Co.; one for $2000, and the other for $1500, for both of which Russell was liable.

On the 1st of November 1848, possession of the Mount Laffee tract was surrendered by Williams to Miller & Co., and the personal property taken by them at $6146.05, at which sum it had been appraised.

Safford recovered judgment on the $1500 note against Russell, November 23d 1848, for $1546.66; and Thomas Earp, endorsee of Safford & Co., recovered judgment on the $2000 note, January 23d 1849, for $2023.05, both judgments being in Philadelphia. Miller became bail for stay of execution on them. Thomas M. Mitchell, endorsee of Safford & Co., obtained judgment in Schuylkill county against Russell, December 21st 1848, for $1009.37, on a note of $1000, which does not appear to be included in the $53,150. On this judgment Russell claimed a stay as a freeholder.

In December 1848, the lessors of Williams distrained for rent, and the property distrained was bought by Miller & Co.

Under a judgment, Tyler & Co. against Williams, all his interest in the lease &c., was sold by the sheriff, May 28th 1849, t

[Russell *v.* Miller.]

Miller & Co., for $100. This sale appears to have been made at the suggestion, and with the assent, of both Miller and Russell.

On the 23d of October 1849, Russell wrote to Miller that there were coming due, before the following January 19th, debts amounting to $11,000, including the Safford and Earp judgments, for which Miller was bail, stated at $3500, and the Mitchell judgment at $1000 principal; and saying further: "The judgments in favor of Mitchell, Tyler and Earp are the first liens on my property, and when paid they can be assigned to you and remain as liens, and I will give you any further security I have. If you can get a loan for me for the whole amount of $11,000, for two or three years, so that I could meet it without much trouble, I will give you $500; but if the $11,000 cannot be had, I must have $7500, cost what it will, as it will not do to let the sheriff sell me out now, after weathering the storm so long."

Miller & Co. wrote to Russell in reply, October 26th 1849:— " In regard to the principal topic presented in your letter, we would say that it will always afford us the greatest pleasure to accede to your wishes when we can do so, but the condition of the business this and last year and our present liabilities, admonish us of the necessity of avoiding increased debt. The amount of our investment in Mount Laffee is large and is so much active capital withdrawn from our business; whilst the additional business of selling and shipping the products of that colliery requires increased capital; for, with thirty days' drafts for wages and cash weekly for tolls and long credit on sales, it absorbs all the money we can raise without depreciating our credit, which it is important should be maintained high in so large a business. * * * It would have been a much more pleasant duty to us to have assented promptly to your proposal, and it is only from a conviction of the necessity of the case that we decline. If we could meet your views, we would not accept any compensation for doing so, but would furnish you the means at what they cost us.

" The first judgment maturing we believe is on the 5th of November; for this we will issue our paper to you, or arrange in some way in which it will be satisfied. The others come due after that, we suppose, and this will give you some time.".

On the 2d of November, Miller & Co. wrote again to Russell, that the Safford claim " must be paid on Monday, and we intended to propose issuing our acceptance to you for the amount, for you to raise the money.

" If you should not be here on Monday next, we will pay the amount of the claims and arrange with you for it when you see us, or perhaps you had better send us by return mail your draft on us endorsed by you at four months for an amount that will cover Safford's claim with charges and interest, and we will endeavor to negotiate it."

[Russell *v.* Miller.]

To this Russell replied, November 3d 1849 :—" I herewith send you my draft on you at four months for $1673$\frac{7}{100}$, the amount of principal, interest and costs of Safford's judgment, and please accept my thanks for your kindness in the matter—and I beg leave to say, there is as much in the manner in which a favor is done as in the favor itself. Your kindness, I hope, I shall never forget."

Miller & Co., November 6th, acknowledged the receipt of the draft and informed Russell that they had paid Safford & Co.'s judgment, and charged his account with its amount.

On the 10th of December Russell wrote to Miller & Co. that Mr. Hughes, who had charge of some of the judgments, had " agreed to take your acceptance at six months for the two judgments, and I have drawn them as he directed,· one, favor of E. Safford & Co., for $1000, and the other favor of Thomas Earp for $2000, which please accept and return me, being for my use and accommodation."

Miller & Co. replied, December 14th : " As requested, we return to you herein your draft, favor E. Safford & Co. six months from December 13th 1849, for $1000, and yours, same date, favor Thomas Earp for $2000—both accepted by us for your use and accommodation, and which you will please provide funds for at maturity. You will please have the judgments in favor of these parties assigned to us or marked for use, or applied in some way as security for these advances by us."

Russell replied on the same day : " Your favor of the 14th, with the two acceptances of $2000 and $1000 for my use and accommodation were duly received, for which I feel much obliged. I have passed them to Mr. Hughes in payment of the judgments, but he will not transfer the judgments to you until the drafts are paid. In this I suppose he is right, as it is the usual course to hold on to all security ; at the same time it does not lessen your security, the judgments being a lien for the same debt."

The acceptances of Miller & Co. for $1673.07 and $3000, for the use of Russell, were renewed from time to time till they ended in the notes on which this suit was brought. There was a very voluminous correspondence between Miller & Co. and Russell.

In 1851 the correspondence exhibits some misunderstanding between them, with reference to Russell's indebtedness and the character of their respective interests in the Mount Laffee colliery ; Russell alleging that his indebtedness to Miller & Co. had been extinguished by Miller & Co.'s receipt of the proceeds of the mines, and claiming the ownership of the lease ; Miller & Co. alleging the contrary.

The last letter from Miller & Co. is dated July 17th 1852 ; they say :—

" Your favor of 13th inst. is received, in which you say that

[Russell *v*. Miller.]

your note for $3000, protested may lie until our other matters are settled, and requesting us to withdraw the other note due 28th inst for $1673$\frac{7}{100}$, and hold it likewise.

" These two notes, amounting together to $4673$\frac{7}{100}$, constitute a claim on you, originating in the acceptance by us (at your urgent request) of your drafts for that amount, exclusively for your use and benefit; and to relieve you from the effects of suits pending, or about being instituted against you; and have no connection with our advances on account of Mount Laffee colliery, but were in the first instance, and have been continued by renewal at your request, as friendly accommodations to you, and to be paid by you.

" We will, as you request, allow the note past due to lie until we meet, and will also withdraw that due on the 28th inst., before maturity, and will take pleasure in conferring with you in regard to their payment when we see you.

" Not admitting any obligation on our part to furnish you with the accounts of the working of Mount Laffee colliery, we would nevertheless, now, as we have done heretofore, take pleasure in exhibiting them, and will be happy to do so, whenever you may favor us with a call, at our office, and have no objection whatever to do so when we may have the pleasure of meeting you in Pottsville."

The defendants under the pleadings and notice of special matter, alleged that the proceeds of the colliery received by the plaintiffs, had extinguished all the indebtedness of Williams and Russell to them, including the notes in suit, and that the plaintiffs were largely indebted to Russell. The rulings of the court on questions of evidence were the subject of exception by the defendants.

Both parties submitted a number of points.

The plaintiffs' points were:—

1. That the notes were for a loan for Russell's special accommodation, and were not connected with any coal transactions. * * *

2. That the accountability was originally and exclusively to Williams: and that there was none to Russell, especially since the sheriff's sale. * * *

The defendants' points were:—

1. That Russell was entitled to the possession of the premises after the debt and advances of the plaintiffs for which they held the lease as security, and the costs and charges of mining and a reasonable compensation for their services had been paid, and that the defendants can claim the profits accruing from the premises over and above such debt, &c., to an amount not exceeding the claim for which Russell held the assignment of the lease as security.

2. If the mines produced a profit to the plaintiffs after paying

[Russell *v.* Miller.]

the debt, advances, &c., then such profit should have been applied to the payment of the notes in suit, and if such profit was equal to the notes in suit, the plaintiffs cannot recover.

3. If the mines produced a profit to the plaintiffs over and above all debts, claims (including the notes in suit), &c., the jury may find in favor of the defendants for the amount of the excess of such profit not exceeding, the amount of the claim of Russell against Williams.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

5. The sheriff's sale of the interest of Williams in the lease and fixtures could only affect that interest and not the interest of Russell, of which the plaintiffs had full notice before the time of the purchase.

6. The sheriff's sale of the interest of Williams and the purchase by the plaintiffs of that interest was subject to the liens in the hands of the plaintiffs, and held by the plaintiffs against it at that time ; and said sale discharged that lien and the claims for which they held the leases and fixtures as security, and they cannot now claim the amount of any such notes, drafts or evidence of indebtedness against Andrew Russell in this suit.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

8. If the parties, Miller & Co., and Russell only arranged to have the resulting interest of Williams sold by the sheriff, and purchased by the plaintiffs, and treated the interest of Russell as subsisting after the sheriff's sale,—then his interest did subsist without regard to any legal' effect of the sheriff's sale, and whether they did so treat it as subsisting after the sheriff's sale is a question of fact for the jury.

The court (Ryon, P. J.) charged :—

" We will answer the defendants' 5th and 6th points as the questions involved on these points must determine this case."

After stating the transactions of the parties before the sheriff's sale, the court said :—

" The property was levied on by the sheriff, and sold, and bid in by the plaintiffs, 28th of May 1849, also landlords sold the personal loose property which was also bid in by the plaintiffs. The notes in evidence and the prior ones, of which these in evidence are renewals, were not in existence until after the sheriff's sale some time, and did not arise out of any claim, or liability of Williams or Russell to Miller & Co., at or prior to the sheriff's sale. The effect of the sheriff's sale was to sell the property subject to the debts of Williams to Miller & Co., then existing, and to discharge the property from the agreements which provided for future advances, so far as regards advances to be made after the sheriff's sale. The notes in evidence are not therefore under the terms of the pledge, and cannot call upon Miller & Co. to account further than so far as will satisfy the indebtedness of Williams

[Russell v. Miller.]

and Russell or either of them, prior and at the time of the sheriff's sale.

" We therefore instruct the jury that the plaintiffs on the whole evidence are entitled to receive the principal and interest of the notes for which the suit was brought."

There was a verdict for the plaintiff for $8516.93.

The defendants removed the case to the Supreme Court, and, besides the rulings of the court on the evidence, assigned for error the refusal of the court to answer their points in the affirmative, and that the court charged "That the effect of the sheriff's sale was to sell the property subject to the debts of Williams to Miller & Co., then existing, and to discharge the property from the agreements which provided for future advances, so far as regards advances to be made after the sheriff's sale. The notes in evidence are not therefore under the terms of the pledge, and Russell cannot call upon Miller & Co. to account further than so far as will satisfy the indebtedness of Williams and Russell, or either of them, prior and at the time of the sheriff's sale;" and that the plaintiffs were entitled to recover.

*E. O. Parry*, for plaintiffs in error.—The assignment of the lease to Miller was a pledge held upon the trusts mentioned in it, and Russell would have been entitled to possession of the premises upon paying the claims for which it was pledged. He therefore had a right to have the net proceeds of the mines applied to extinguish the debt for which the lease was held as security, and this would be a competent defence in this suit.

At the time of the sheriff's sale the only interest Williams had was to have the property upon paying Russell and Miller, and this, therefore, was all the sheriff could sell, and all that Miller & Co. acquired by their purchase. The sale and purchase could not affect Russell's residuary interest, nor affect his contracts with Miller & Co., and Russell had the same right as before the sale to have possession of the property on paying the debt and charges against it: Patterson *v.* Horn, 1 Grant 302, 305; 2 Tudor & White's Lead. Cas. in Eq., part 2; Hare & Wallace's note, 430–450.

*J. W. Ryan* and *B. W. Cummings*, for defendants in error.— The notes in suit had no relation to the colliery, but were for Russell's personal use, and continued by renewals as a friendly accommodation. The main question is, can the complicated accounts between the plaintiff, Russell and Williams be investigated and balances struck for the purpose of set-off on behalf of Russell only. There was no collateral security given for these notes, and they cannot be subject to set-off from the colliery

4 P. F. Smith—11

transactions.  These accounts must be settled by bill in equity or account render.

Set-off should not be allowed when it will give rise to new disputes: Mingle *v.* Stiles, 7 Casey 73; Johnson's Appeal, 1 Wright 268.  Debts sued for and the set-off must be due in the same right: Smith & Co. *v.* Myler & Aber, 10 Harris 40; Tustin *v.* Cameron, 5 Whart. R. p. 380; Wrenshall *v.* Cook & Schoyer, 8 Watts 464; Stewart *v.* Coulter, 12 S. & R. 52; McQuade *v.* Stewart, 12 Wright 200.

[During the argument READ, J., referred to Uhler *v.* Sanderson, 2 Wright 128.]

*J. Bannan*, for plaintiff in error, in reply.—Williams was not interested in the set-off.  His interest was a residuary one after payment to Russell.  There was no joint interest between Williams and Russell.

The opinion of the court was delivered, February 25th 1867, by AGNEW, J.—A careful examination of the voluminous correspondence and testimony in this case proves that the debts contained in the judgment of Safford & Co. and of Thomas Earp against Andrew Russell were for the indebtedness of Thomas C. Williams, and can be traced into the liabilities aggregated at $53,150, acknowledged by Williams December 24th 1847, and contained in Russell's detailed statement of December 30th 1847.

This aggregate was the sum of the liabilities of Williams secured by the assignment of his lease to Russell at the time when the latter, on the 27th December 1847, assigned over the lease to Charles Miller & Co.  The $1000 note contained in Thomas Mitchell's judgment I have been unable to trace through the mass of evidence into the statement of December 30th 1847.  Possibly it can be, but it is immaterial, as the liabilities of Russell to Safford & Co. on account of Williams, will suffice to raise the material question in this case.

The Safford & Co. claims of $3500 being debts incurred by Russell for Williams before his assignment to Miller & Co. were protected by Williams's assignment to him, and would follow the lease.  But this effect is attributable to the force of Williams's assignment to Russell, and not of Russell's to Miller & Co., excepting so far as Miller & Co. took the lease from Russell *cum onere*.  But it is the effect of the advances of Miller & Co. to Russell we are now considering, and this evidently depends upon the fact whether these advances were made upon the security of the colliery under Russell's assignment to them.  It is only by establishing this relation between the debts in suit and the profits of the colliery that these profits can *per se* go in extinguishment of these debts.  The security of the assignment from Russell to

[Russell *v.* Miller.]

Miller & Co. is the only link which couples them together. That assignment was made to secure Miller & Co. for $23.150 liability already incurred, and also for future loans and liabilities for Russell.

But they were not bound by its terms for any particular sum to be advanced or liability to be incurred, and could therefore cease to advance or to incur responsibility, upon the security of the colliery, when they deemed it prudent to stop. If they chose not to add to the burden on the colliery, and to require other security, or even to make it a debt of honor, to be met by Russell at maturity, they could do so. So long as Williams continued to be the owner of the colliery, and his assignment to Russell a security for his debts, it was their interest to suffer their advances to Russell on account of Williams's liabilities to rest upon that security. But that interest ceased when they became the purchasers, on the 28th May 1849, for any new burden thus cast upon the colliery in their own hands only increased the extent of the liability for the profits to be accounted for to Russell on his assignment. While they might not shake off the liability for profits already accrued, they as owners of the resulting interest in the lease might not wish to diminish that interest by increasing the debt upon it. The case therefore hinges upon the fact whether the advances resulting in the notes in suit were made by Miller & Co. to Russell on the credit of the colliery. If they were then holding the colliery under the assignment as a security for these advances, the profits received from it would attach to these debts, and go in extinguishment, otherwise the debts would have no connection with the profits, and the latter would stand but as an independent claim of Russell, through their duty to account to him for the profits received under his assignment to them. On this point the judge in the court below charged in substance that the notes being outside of the pledge as a collateral security, the plaintiff was entitled to a verdict. In this he appears to have been right. The correspondence shows very clearly that the advances from which these notes arose were made to Russell on his private account, and not on account of the colliery. When the judgments were about to fall due, Russell was anxious to raise money to avoid a sheriff's sale, and wrote to Miller & Co. to effect a loan for him to the amount of $11,000, proffering a reward of $500 for their trouble, and saying he must have $7500, cost what it would. He also mentioned that the Mitchell, Tyler and Earp judgments were joint liens, and when paid could be assigned to them, and he would give any further security he could. Miller & Co. declined, stating that the state of their own business admonished them to avoid increased debt, and that their investment in the Mount Laffee colliery was large, withdrawing that much active capital from their own business.

[Russell *v.* Miller.]

The result was that to befriend him they permitted him to draw upon them for his own use and accommodation, with a distinct request to provide funds to meet the drafts at maturity.

For this he expressed his gratitude, saying the kindness was one he could never forget.

The correspondence on this subject afterwards shows that the debt was his personal debt, and the notes were finally charged against him in his private account when he failed to pay them. The equitable defence, therefore, failed on the ground that the profits of the colliery were not pledged to their payment.

The next question is whether failing as an equitable defence, Russell's executors were entitled to demand an account of the profits in this action as an independent set-off to the sum which should be found due from Miller & Co. As such a counter claim it was not competent to be set off. A debt or the damages which can be set off as an independent counter claim must be such as a jury can find and liquidate in the ordinary way just as if the defendant were a plaintiff suing in debt, assumpsit or covenant.

But where the right of the defendant is only to call the plaintiff to an account, and his demand is such as must be settled in an action of account render, or by a bill in equity for an account, it is not a proper set-off. A jury cannot pass on a question of this nature without great inconvenience. A set-off to a set-off will not be permitted, and it would be much worse to try before a jury at bar an unadjusted question of account and of profits arising out of a long and complicated business to be found only in numerous books of account.

These views cover all the assignments of error; for the exclusion of the whole defence puts out of the case all questions arising under it.

The judgment is affirmed.