# Fifth Mutual Building Society of Manayunk's Appeal.

Argued December 4, 1934.    Before FRAZER, C. J.,
SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN,
JJ.

*Francis S. Cantrell, Jr.,* for appellant.

*William W. McKim,* with him *Shippen Lewis,* Special
Deputy Attorney General, and *William A. Schnader,*
Attorney General, for appellee.

OPINION BY MR. JUSTICE MAXEY, January 7, 1935:

The basis of this action is a duly executed policy of
insurance reading as follows: "This policy of insurance
witnesseth that the Manayunk Trust Company in con-
sideration of the sum of Twenty and no/100 dollars, to
them paid by Fifth Mutual Building Society of Mana-
yunk does hereby insure the said Fifth Mutual Building
Society of Manayunk and all other persons to whom
this policy may be transferred with the assent of this
company, testified by the signature of the proper officer
of this company endorsed hereon, that the title of the
Assured to the estate, mortgage, or interest described
in Schedule A hereto annexed, is good and marketable

and clear of all liens and incumbrances charging the same at the date of this policy; saving such estate, defects, objections, liens and incumbrances as may be set forth in Schedule B, or excepted by the conditions of this policy hereto annexed and hereby incorporated into this contract. Liability hereunder shall not exceed Eight Thousand and no/100 Dollars, and any loss shall be payable upon compliance by the assured with the conditions hereto attached and not otherwise." Then follow Schedules A and B and "Conditions of this Policy." At the time the policy was issued and the insured mortgage was taken by the building society there was then on record in favor of the Hilltop Building & Loan Association of Philadelphia a judgment d. s. b. in the sum of $6,000 under which judgment damages later were assessed at $3,381.25. This judgment, admittedly a prior lien to the insured mortgage, was not scheduled or excepted in the title policy.

The secretary of banking, on October 13, 1931, took possession of the business of the trust company, because of insolvency, under section 25 of the Act of 1923. The building society was then indebted to the trust company in the sum of $23,500. The insured mortgage, being in arrears, foreclosure proceedings were instituted as of June Term, 1932, by the building society. The notice from the Hilltop Association to the building society, of the former's judgment lien, was dated July 20, 1932. On the next day by writing the building society notified the special deputy in charge of the affairs of the trust company of this prior judgment against which the title policy insured.

The property was sold under a writ of levari facias issued in the foreclosure proceedings by the sheriff of Philadelphia County on November 7, 1932, for the sum of $3,600. On December 21, 1932, the sheriff distributed and paid out from the fund so realized $3,246.42 to the Hilltop Association to apply on its judgment. To the extent of this last amount it is undisputed that the

building society suffered a loss against which it was insured by the policy, and for this amount the building society filed its claim against the trust company.

On September 15, 1933, the secretary of banking filed his first and partial account of the affairs of the trust company and on October 13, 1933, the building society filed its exceptions claiming that it was entitled to set off this claim against the greater amount due on its note of $23,500. The exceptions were dismissed by the court below upon the ground that the exceptant's loss was not "definitely ascertained" and that it "had only a contingent claim against Manayunk Trust Company, and at the time when the secretary of banking took possession of that institution on October 13, 1931, there was no measure or standard by which the damages of exceptant could be liquidated . . . there had been no loss. That loss was not ascertained until the sale by the sheriff in November, 1932. Up until that time, it was entirely possible that there would be no loss at all. If bidders at the sheriff sale had bid the property in for sufficient to discharge exceptant's claim in full, exceptant would have had no claim."

The error in the position thus taken is that a loss or damage distinctly insured against does not become a legal loss until its amount is "definitely ascertained." The policy might by apt language have provided that the liability of the insurer would not attach until the loss had been definitely ascertained by execution on any judgments the policy insured against or others, but in fact it did not do so. In Trenton Potteries Co. v. Title Guarantee & Trust Co., 176 N. Y. 65, 68 N. E. 132, the Court of Appeals, by WERNER, J., said: "The contract is one of insurance against defects in title, unmarketability, liens, and incumbrances. The risks of title insurance end where the risks of other kinds begin. Title insurance, instead of protecting the insured against matters that may arise during a stated period after the issuance of the policy, is designed to save him harmless

from any loss through defects, liens, or incumbrances that may affect or burden his title when he takes it. It must follow, as a general rule, therefore, that when the insured gets a good title the covenant of the insurer has been fulfilled, and there is no liability." The converse of this is that when the insured gets a bad title, or the policy has been otherwise breached, the covenant of the insurer has not been fulfilled, and there is a *liability*. A liability having attached, the only thing that remains is to ascertain *its extent* in terms of dollars.

Reduced to simple words the contract of insurance now before us said: "This insurer asserts that there is no lien on premises No. 439 in the 21st Ward of Philadelphia, except a mortgage for $4,000 (describing it), and if and when the insured places a mortgage on said property we guarantee that it will be a valid lien on that property subject to nothing but a prior mortgage of $4,000." Relying on this insurance, the exceptant took a mortgage of $8,000 on a property which, because of total liens against it of $10,000 instead of $4,000, was worth as a pledge $6,000 less than the insurer had declared it to be. If the insured had tried to sell his $8,000 mortgage, he would have found its marketability impaired by the fact that it was subject to two liens totalling $10,000 instead of to one lien of only $4,000. Even though it was backed by an insurance policy, a prospective purchaser would give substantially less for it with these two liens against it instead of the one lien specified. The would-be purchaser would naturally consider the possibility that, should foreclosure proceedings be instituted and the company be called upon to make good its contract of insurance, it might be in no financial condition to do so (as actually happened here). When it was disclosed that, contrary to the insurance contract, there was no encumbrance on this property except one of $4,000, there was a total encumbrance of $10,000, the insurer then and there became legally liable for its breach of contract to the insured. The

latter could *then* have sued the insurer for the loss sustained, and the measure of damage would have been the difference in the market value of the $8,000 mortgage which in fact was subject to both the disclosed lien of $4,000 *and* the undisclosed lien of $6,000, and *what* its market *value would have been had it been subject only to the former.*

In the instant case the learned court fell into error by giving too much weight to the possibility that the property subject to exceptant's mortgage *might have* sold for enough to satisfy it. We said in Brock's Assigned Est. (No. 1), 312 Pa. 7, 16, 166 A. 778: "The absoluteness of a present obligation to pay a certain amount of money on a future day is not affected by the fact that there is a possibility that the obligation will never have to be discharged by the obligor. That possibility attends all legal obligations. For example, A for a valuable consideration absolutely promises to pay B $1,000 in one year. It is *possible* that A will never have to make that payment, for B may cancel the debt, or some generous relative or friend may pay it for A. . . . In strict accuracy all commitments for the future are 'contingent.'" No percentage of chance, however high, that one will not be called upon to pay a debt he owes can affect the debt's legal status as an obligation.

We agree that the trust company was an indemnitor and, as stated in Brock's Assigned Est. (No. 1), supra, "An indemnitor's obligation is not immediate and absolute. It is born only on the happening of a contingency, that contingency being the default of the person whose favorable action the indemnitor guarantees. A surety's obligation is a living thing subject to possible extinction; an indemnitor by his engagement has merely put himself in a position where he may in the future be shouldered with an obligation that can legally come into being only through another's default." Applying these principles here, the indemnitor's obligation came into being when the appellant invested the sum of $8,000

in the insured mortgage upon the assurance of the trust company that there were no liens prior to that mortgage except the one of $4,000 specified. That *was* the trust company's default. The default was practically contemporaneous with the execution of the contract of indemnity, whereas in most cases arising on contracts of indemnity the default is *subsequent* to the contract. The error in appellee's reasoning is his assumption that the contingency which gave rise to the indemnitor's obligation was the *demonstration* of loss by the sale of this property by the foreclosure in 1932, and that until then there was no default by the indemnitor, whereas in fact the trust company's obligation came into being on April 15, 1930, when $8,000 was invested by appellant in a third lien in reliance upon the trust company's insurance policy. The foreclosure proceedings two years later merely *concretely demonstrated* the extent of exceptant's loss and of the company's reciprocal obligation. The loss sustained could have been measured by appropriate proceedings any time after the investment had been made. In a suit for damages for breach of the insurance policy the insured could have offered testimony showing (1) the value of the security if the record as to liens had been as the company had insured it to be, (2) its value with the record as it actually was, and (3) how much its own $8,000 mortgage had been reduced in value by reason of the diminution in the value of the pledged security. In Whiteman v. Merion Title & Trust Co., 25 Pa. Superior Ct. 320, which was a suit upon a policy of title insurance where the company agreed to indemnify, keep harmless, and insure the insured from all loss or damage, not exceeding $1,500 which the said insured shall sustain by reason of defects or unmarketability of the title of the insured to the estate, mortgage or interest described in a schedule annexed, or because of any liens on it, or encumbrances, "charging the same at the date of the policy," and there was a total loss to the insured by reason of

the sale of the property mortgaged under a prior mortgage in existence at the date of the policy, it was held that the insurance company was liable only for the actual value of the land, and not for the amount of the mortgage insured. The Superior Court there said: "What he [i. e., the insured] has lost, if the averments of the affidavit of defense are true, is the right to a lien upon land which is worth only $500, and that is the limit of his right to recover." In other words, the measure of the company's liability was the value of the pledge that had been wiped out. By parity of reasoning, if in the instant case it had been determined that the pledge "securing" the mortgage of $8,000 had been reduced in value to an amount less than $8,000, the measure of damages would have been the amount by which the undisclosed judgment of $6,000 *had,* in impairing the value of the security, *reduced the value of the mortgage.* That this damage was not measured until two years later does not prove its earlier *non-existence.* Measuring is not a creative act. If, for example, the appellant had purchased a lot of land underlaid with anthracite coal and the trust company had given the appellant an insurance policy that its deed included not only the surface but also the right to surface support (i. e., the "third estate": see Penman v. Jones, 256 Pa. 416, 100 A. 1043), and it did not in fact include such support, the insurer's liability would have attached the moment the insured parted with his money in reliance on the policy. Under the theory contended for here, it would not be obligated to indemnify the insured *until the surface had subsided, thus visibly demonstrating* the damage. That is, of course, erroneous (Noonan v. Pardee, 200 Pa. 474, 50 A. 255); it was equally erroneous to hold here that the insurer was not answerable to the insured for the impairment of the latter's security until damage caused by that impairment had been visibly demonstrated by a sale. When in this class of cases such a sale does take place, courts accept the result as

furnishing the best data for measuring damage, but the sale does not *give rise* to the loss nor is it ever the only available method of determining its extent. In bankruptcy, it is not uncommon to list liabilities whose monetary measurement is a matter for the future. In Maynard v. Elliott, 283 U. S. 273, it was held that "the liability of a bankrupt as endorser of a promissory note which was not matured at the time of the adjudication is provable, as a claim 'founded . . . upon a contract express or implied.'" In that case, Mr. Justice STONE said: "That some contingent claims are deemed not provable does not militate against this conclusion. The contingency of the bankrupt's obligation may be such as to render any claim upon it incapable of proof. It may be one beyond the control of the creditor, and dependent upon an event so fortuitous as to make it uncertain whether liability will ever attach. . . . Or, the contingency may be such as to make any valuation of the claim impossible, even though liability has attached." In determining any person's liabilities, debts other than those that are absolute and matured are properly included. For example, the Uniform Fraudulent Conveyance Act of May 21, 1921, P. L. 1045, provides, inter alia, in its first section that "'debt' includes any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent."

That there may be in legal contemplation a loss before there is an actual monetary loss sustained, is recognized in the case of Seattle & S. F. Ry. & Nav. Co. v. Maryland Casualty Co., 96 Pac. 509, 510, 18 L. R. A. (N. S.) 121, where a liability insurance policy provided that no action should lie thereunder, unless brought to reimburse insured for loss actually sustained and paid by him in satisfaction of a judgment after trial of the issue. An employee recovered judgment against the insured for personal injuries, and release thereof was obtained by giving insured's note for the amount of the judgment, in full satisfaction thereof, and it was held that there

was a "loss" within the meaning of the policy which would support an action thereunder, notwithstanding the possibility of insured's insolvency or of compromise for less than the amount of liability under the policy. In that case the court said: "The argument is made that there is no loss within the meaning of the above [quotation from the policy] until cash has been actually paid in satisfaction of the judgment. The conveyance of property in satisfaction of the judgment would certainly establish a loss; at least, to the extent of its value."

Applying that reasoning to the instant case we may say that the argument is made that appellant suffered no loss until the cash value of his loss has been ascertained by concrete demonstration and the answer to that is that the reduction in value of the lien which he accepted on the faith of the insurance company's policy established a loss to the extent of the resulting reduction in value of the mortgage secured thereby. All that remained was to liquidate the loss by proving by competent testimony what that latter reduction amounted to.

In Murphy et al. v. United States Title Guaranty Co., 172 N. Y. S. 243, it was said by Judge LEHMAN: "There seems to be . . . a dearth of authority in regard to the measure of damages applied in an action on [a title] insurance policy. . . . In many points the covenants of title contained in a deed and the covenant of indemnity contained in a title insurance are analogous, and in the absence of express words in the contract of insurance the same rules would apply. The measure of damages in an action for the breach of the covenant of seisin is ordinarily the consideration paid by the grantee for the property, and the grantee need not wait until he has been evicted by superior title, *but may bring his action as soon as he discovers his grantor's lack of title* [italics supplied]. Sutherland on Damages, section 597." The first headnote of this case reads: "Under title insurance

policy, held, that assured, for rejection of contract of sale because of defect in title, would be entitled only to recover for actual loss suffered through existence of incumbrance, which, at most, would be the difference between the value of the property as incumbered, and its unincumbered value, and not the sum which purchaser agreed to pay for the property." "The [title insurance] policy was broken as soon as made, and the damages resulting must be determined as of the time of the breach": Flockhart Foundry Co. v. Fidelity Union Trust Co. (N. J.), 132 A. 493.

Title Ins. Co. of Richmond v. Industrial Bank of Richmond, 157 S. E. 710, was an action on a title insurance policy, under the terms of which defendant undertook to indemnify plaintiff as mortgagee against loss by reason of any defect in the title, unmarketability of the title, or by reason of liens or incumbrances resting upon the property (with certain exceptions, to wit, the $4,000 deed of trust) at the date of the policy, when as a matter of fact there were liens arising from street assessments entered against this property. In that case, the Supreme Court of Appeals of Virginia said: "When the insured gave up its notes for a title that was insured, it had reason to believe that title unimpaired. It thought it obtained an unimpaired title, but it did not. At that time it suffered a loss equal to the amount of liens of the street assessments, although it did not know it. . . . The plaintiff's loss occurred at the time it, relying on the policy, made its purchase, and is not measured by what it might realize at some future time under other conditions. The insured's right to indemnity accrued at the date of its first purchase but it did not know the facts that entitled it to claim indemnity. This excused it from, at that time, calling upon the insurer. . . . *The insurer's liability became fixed when the insured relying on the policy made a bid at the first foreclosure and failed to receive the subject-matter of its purchase unimpaired by the street assessments.*" (Italics supplied.)

In Foehrenbach v. German-American Title & Trust Co., 217 Pa. 331, 66 A. 561, the plaintiff, believing himself the owner of certain premises, applied to a title company for title insurance in the usual form, in the sum of $5,000, against liens or defects in title affecting the premises. A policy was issued covenanting that the company "will indemnify, keep harmless and insure [Foehrenbach] against all loss or damage not exceeding $5,000 which the said insured shall sustain by reason of defects of the title of the insured to the estate . . . or interest described in Schedule A." Schedule A showed that the interest of the insured covered by the policy was as "owner in fee." It subsequently developed in partition proceedings that the bona fide belief under which the insured had acted in securing the policy for himself as "owner in fee" was erroneous and that, under the will of his mother from whom he claimed title, he was the owner of only an undivided one-half interest in the property. The property was sold under these proceedings and Foehrenbach was awarded his share of the proceeds. He then brought suit in assumpsit against the title company to recover the difference between the value of the property less the amount of the award by the orphans' court, a few small items of credit, and the money paid his assigns. A case stated was agreed upon. Judgment was entered as follows: "This policy is not a guaranty of title, but a contract of indemnity. The plaintiff has lost nothing. Judgment for defendant on case stated." This court in reversing the court below said: " 'Loss is a relative term. Failure to keep that which one has, is loss. . . . Title insurance is designed to protect the insured, and save him harmless from any loss arising through defects, liens, or encumbrances that may be in existence, affecting the title when the policy is issued. . . . Can there be any doubt that the reduction of his [plaintiff's] interest in the property from an ownership of the whole, to that of one-half, was a defect, coming directly within the terms of the policy? . . . It requires no argument to show that the abso-

lute failure of title to one-half the interest was a serious defect, as compared in extent and quality with the title to the entire interest, which he had asserted and submitted to the defendant company, as the basis upon which the insurance was to be effected, and which was accepted and approved by it, as set forth in the policy. The estate or interest of the insured which was covered by the policy was that of owner in fee of the entire property. Any defect in title *which reduced his interest* [italics supplied] below that point was, it seems to us, just that much loss, or damage, for which he was entitled to be indemnified." Applying the reasoning of that case to this, we hold that any defect insured against which reduced the insured's interest below the point agreed to, to wit, a reduction by a lien of $6,000 was a loss or damage for which he was entitled to be indemnified. It is true the case cited says: "Actual loss, of course, must precede the right of compensation; but that is measured by the standard accepted as between the parties." This is a recognition of the fact that "actual loss" and the measurement of that loss are two distinct things. The "actual loss" was that the insured got only a half interest in a property though he had been *insured* a whole interest. The "actual loss" was then and there sustained though it was not measured until later. The words "actual loss" have been judicially defined. In My Laundry Co. v. Schmeling, 109 N. W. 540, 549, 129 Wis. 597, the court held that an actual loss "means loss recoverable in an action."

The case of Pa. Co. for Ins. on Lives, etc., v. Central Trust & Savings Co., 255 Pa. 322, 99 A. 910, was a suit on a title policy. Plaintiffs had purchased a mortgage of $21,000 on a number of houses embracing a building operation in Philadelphia. The buildings were at the time unfinished and defendant issued a policy in the sum of $21,000, insuring plaintiffs against, inter alia, " 'actual loss or damage not exceeding $21,000, which the said insured shall sustain by reason of noncompletion of premises.' " An appeal was then allowed to this court. In

that case the only question before the court was the proper construction of a certain subrogation clause in the policy. Nevertheless the report of the case indicates that testimony was taken as to whether or not there was an actual loss or depreciation in the value of the mortgage, because of the failure to complete the houses. This court said, in an opinion by Mr. Chief Justice FRAZER: "Defendant contends sufficient equity remained in the properties released from the mortgage to cover the actual loss sustained and witnesses for plaintiffs valued the properties at twenty-two hundred dollars and four thousand dollars, the first mortgages thereon being respectively fourteen hundred dollars and two thousand five hundred dollars. The properties, however, were duly taken into consideration by the experts who testified to the amount of depreciation in value of the mortgage, so that defendant really obtained whatever benefit was to be derived from them."

To interpret the word "loss" in a case of this kind as meaning a loss or damage *demonstrated by a sale of the property* is an unwarranted restriction of language. In Banes v. New Jersey Title Guarantee & Trust Co., 142 Fed. 957, Circuit Judge ACHESON said: "Defendant's guaranty is against loss or damage which the plaintiff shall sustain by reason of defects of title or because of liens or incumbrances as specified therein. Therefore, by the very terms of the contract, it was incumbent upon the plaintiff to show some loss or damage. This is the general doctrine in actions on contracts of indemnity [citing cases]. In this case there was no proof whatever of any loss or damage to the plaintiff. No defect of title to the land covered by the mortgage appeared, nor was it shown that any lien or incumbrance charging the same existed." We interpret this as meaning that if there had existed an unspecified lien or incumbrance charging the land, this would have amounted to a proof of loss, whose measurement would be a matter of evidence. This is the position we take in the case at bar. If the appellant had

purchased an oil painting in reliance on an insurance policy that it was a genuine Corot and it proved to be only an imitation, the insured's liability for the loss would have attached immediately. It would not have required a sale to call that liability into being or even to have measured the extent of the loss. For example, in sales of goods the buyer may sue for breach of warranty without either selling or returning the goods. In an early case this court, in an opinion by Chief Justice TILGHMAN, drew a distinction between "utterly lost" and "technically lost" as applied to a ship. He said: "But she is not utterly lost merely because it may cost more than she is worth to repair her": Ins. Co. v. Duval et al., 8 S. & R. 138, 148. It would seem from this that when a ship or other object is damaged, a "loss" has been sustained.

When it became manifest that the lien which the Trust Company had insured against was actually in existence, thereby reducing the value of plaintiff's third mortgage, a loss was established and the next step was to measure its extent. This was done when a sale of the property took place, though it could have been done before. In Hymes v. Esty et al., 133 N. Y. 343, 31 N. E. 105, it was held that in an action for breach of a covenant of quiet enjoyment, the correct measure of damages is the diminution in the value of the lot at the time of the eviction, caused by the assertion of the right to use the strip as a street, with interest to the time of trial, and the costs of the action which resulted in the eviction, with interest thereon from the time of the recovery.

Our conclusions in this case are:

(1) That when the insured parted with $8,000 on the strength of the Trust Company's insurance that there was no prior lien on the property except the $4,000 mortgage specified, it sustained damages or loss recoverable in an action.

(2) That the liability of the insurance company to pay the appellant a sum equivalent to the damages or loss

sustained existed from that date and that the only duty that remained on appellant was to demonstrate in terms of dollars the amount of that damage.

(3) The Trust Company being under legal obligation to indemnify the appellant from the moment the latter parted with its $8,000 on the strength of the former's assurance that no second lien of $6,000 existed, though it did in fact exist, appellant was entitled at anytime thereafter to set off against the Trust Company's claim against it the amount of the damage or loss it had sustained by the breach of the insurance contract.

It is true that on October 13, 1931, when the secretary of banking took possession of the business of the Manayunk Trust Company the appellant's claim against the trust company on the then existing liability of the trust company to it had not been liquidated but that claim was capable of liquidation by a known legal standard and that is all that is necessary to a set-off under the Act of January 12, 1705, 1 Sm. Laws 49. In Fisher, Commissioner of Banking, v. Davis, 278 Pa. 129, 122 A. 224, this court said in an opinion by Mr. Justice SIMPSON: "With us the right of defalcation has existed since the passage of the Act of January 12, 1705, 1 Sm. Laws 49, and has been constantly applied to estates where insolvency existed and the law established preferences in distribution. Thus, in suits brought by executors or administrators, where the creditor's claim was due when decedent died, set-off has always been allowed even though his estate was insolvent: Murray v. Williamson, Administrator of Gray, 3 Binney 135; Com. v. Clarkson, Administrator of Skiles, v. Houston, 110 Pa. 254 [2 A. 30]. The reason for this conclusion is tersely expressed in the second of these cases as follows (page 293): 'The sum really due at the death of the party is the true debt. On no other principle could there be a set-off against the representatives of an insolvent decedent.' . . . Two minor claims are made by appellee, each of which is without merit. It is said the amount due, because of the receipt

and sale of the bonds, has not been liquidated and hence cannot be set-off. This very inadequate view of the effect of the Act of 1705, is in the teeth of all of our decisions: Russell v. Miller, 54 Pa. 154; Halfpenny v. Bell, 82 Pa. 128; Plunkett v. Sauer, 101 Pa. 356; Long v. Long, 208 Pa. 368 [57 A. 579]. In the second of these cases it is said, at page 130: 'It was held in Hunt v. Gilmore, 9 P. F. Smith 450, that unliquidated damages arising ex contractu from any bargain, may be set off under the Defalcation Act of 1705, 1 Sm. Laws 49, whenever they are capable of liquidation by any known legal standard.' "

Hunt v. Gilmore, 59 Pa. 450, was an action on notes given for land agreed to be sold. A set off was claimed because of the failure of plaintiff to give defendant possession. The trial court instructed the jury that they might assess such damages as the evidence would warrant for such violation of the agreement. The jury found for the defendant in the sum of $450. Plaintiff moved for a new trial. The court overruled the motion, quashed the certificate finding $450, and directed judgment to be entered for the defendant. The defendant appealed because the court did not enter judgment for the amount of $450 as found by the jury. This court sustained the right to a set-off and entered judgment for the defendant in the sum of $450. Speaking for the court Mr. Justice SHARSWOOD said, quoting with approval from the opinion of this court in Phillips v. Laurence, 6 W. & S. 150: " 'But I can entertain no doubt that the Defalcation Act allows the defendant to set off a demand, such as the defendants allege they have in the present case against the plaintiffs, arising out of a bargain or contract, when, although the sum claimed, legally speaking, consists of damages, and cannot be reduced to certainty by the terms of the bargain itself, yet the law has fixed and given a standard by which it can be ascertained by a jury of the country.' "

In the case of Ellmaker v. The Franklin Fire Ins. Co., 6 W. & S. 439, which was an action on a covenant of guaranty of a bond, defendant pleaded a set off from a loss

under a policy of insurance on the mortgaged premises executed by the plaintiffs *guaranteeing the premises free from mechanics' liens*. The court below sustained the demurrer to the plea of set-off. This court reversed the court below saying, in an opinion by Chief Justice GIBSON: "If an unliquidated cross demand may be set-up when it has sprung from the same transaction—and we have constantly ruled that it may—why may it not be set up when it has sprung from a distinct and independent contract? The confusion incident to the trial of distinct issues in the same action is no greater where the demands. are independent of each other than where they are connected; nor more embarrassing where they are indefinite than where they are liquidated; nor more complicated where they are set against each other than where they are joined in the same declaration or in consolidated actions. *The practical difference between a debt properly so called and an indefinite demand of money resting in contract, is more seeming than real.* [Italics supplied.] A bond for the payment of a sum certain is strictly a debt and a subject of set-off; yet to ascertain the amount due on it when *reduced, as it sometimes is, by failure of consideration or a variety of causes, is often one of the most difficult duties that can be committed to a jury.* When its definite character is so often deceptive, what better claim has it to be made matter of set-off than a policy of insurance?"

Contrary to appellee's contention and the lower court's finding, appellant *had before October 13, 1931* (the date the secretary of banking took possession of the trust company) sustained a loss by reason of the breach of the insurance contract. The *amount* of this loss being later measured, i. e., liquidated, appellant is entitled to set it off against appellee's reciprocal claim.

The judgment is reversed with a procedendo.