## Auger v. Children's Hospital of Philadelphia

*Keith S. Erbstein,* for plaintiffs.
*Lisa Luborsky,* for defendant PIGA.
*Allan H. Starr,* for defendant CHOP.
*William J. O'Brien,* for defendant Bridges.
*Mathew T. Corso,* for defendant Norwood.

MOSS, *J.,* March 5, 1999—

## FACTS AND PROCEDURAL HISTORY

This medical malpractice action resulted from events surrounding a July 1, 1992, operation on 6-month-old Jeanie Auger to correct a congenital heart defect. During the operation, plaintiffs' child hemorrhaged when the right atrial line that had been placed near her heart during surgery was discontinued. As a result of internal bleeding, she sustained hypoxic encephalopathy (brain injury).

The parties reached a settlement of $2,350,000 on August 19, 1997, subsequent to negotiations we conducted. Disbursement, however, awaited orphans' court approval under Pa.R.C.P. 2039 and correspondingly Phila.Civ.R. *2039.1 concerning settlement distribution in a minor's compromise action. Plaintiffs (Auger) filed

the required minor's compromise petition on November 14, 1997, which the Honorable Petrese B. Tucker granted on April 24, 1998. All settlement proceeds were then paid to plaintiffs except $200,000 tendered by Dr. William Norwood and his private medical malpractice insurer, PIC Insurance Group Inc.

PIC could not pay its share because between settlement and orphans' court approval, PIC had been placed into liquidation on January 21, 1998 by the Commonwealth Court of Pennsylvania. The PIC bankruptcy resulted in a court-ordered 90-day stay until April 23, 1998 on all proceedings against PIC or any party PIC was obligated to defend. Thus, between January 21, 1998 and April 23, 1998, the orphans' court could not rule on said minor's compromise petition. Thereafter, the Pennsylvania Property and Casualty Guaranty Association (PIGA) became responsible for PIC's obligations pursuant to the Pennsylvania Property and Casualty Insurance Guaranty Association Act, 40 P.S. §991.1801 et seq., PIC's policies, and Commonwealth Court's liquidation order.

Plaintiffs filed a petition to enforce settlement on June 24, 1998 to recover the remaining $200,000 settlement funds from Dr. Norwood. PIGA filed a petition to intervene pursuant to Pa.R.C.P. 2327 which we granted conditioned upon PIGA's $200,000 escrow payment to the prothonotary pending our decision. PIGA did not dispute its obligation to pay out settlement proceeds to the plaintiffs, thereby indemnifying (at least partially) Dr. Norwood and PIC. However, PIGA asserted it should be entitled to a statutory offset under the Act for any payments made by other insurers resulting from the alleged malpractice. We heard oral argument on October 26, 1998

on said petition to enforce settlement and signed an order on November 2, 1998 directing PIGA to pay plaintiffs the full $200,000 plus interest. We denied the petition to enforce as to defendants Norwood and Children's Surgical Associates Ltd.

PIGA did not file a timely appeal. However, we granted PIGA's petition for return of security and leave to appeal nunc pro tunc to Superior Court on February 9, 1999 since they alleged they had not received a copy of our November 2, 1998 order. Plaintiffs have filed a cross-appeal.

## DISCUSSION

The main issue is whether PIGA would be responsible for the full $200,000 in unpaid settlement funds, or whether it is entitled to deduct a "statutory offset" for any insurance proceeds plaintiffs received. The parties stipulated if the statutory offset applied, PIGA could deduct the full $200,000. Related issues were whether the money was a liquidated claim when PIC tendered its policy limits or remained open until the orphans' court approved said minor's compromise; and whether Dr. Norwood would be personally liable for any shortfall if we decided in PIGA's favor. For reasons discussed below, we granted plaintiffs' petition to enforce settlement, holding PIC's bankruptcy triggered PIGA's obligation to pay the entire $200,000 liquidated claim PIC and its insured had tendered in the August 1997 settlement agreement.

Despite PIGA's arguments, situations do arise where it is not entitled to a "statutory offset" under the Guaranty Association Act. We were aided in reaching our decision by a recent opinion entered by the Honorable

Lawrence E. Wood. In *McCarthy v. Bainbridge M.D.*, Pa. C.P., Chester Co., civil action no. 92-08969, October 1998, Judge Wood states:

"I am called upon to decide whether or not a claimant against the Pennsylvania Property and Casualty Guaranty Association whose claim arises out of the insolvency of a medical malpractice insurer must deduct from that claim amounts received from a life insurance company. I conclude that the claimant need not do so." *Id.* at 1.

The timing, the PIC bankruptcy and settlement amount in *McCarthy* was similar to the Auger settlement: "the plaintiff's family brought a wrongful death and survival action against defendants, and the matter was referred to PIC Insurance Group Inc. for defense. On January 19, the parties settled the case for $200,000. On January 21, PIC was declared insolvent, and a liquidator appointed. Under the terms of the relevant statutes, the claim was then assigned to the Pennsylvania Property and Casualty Insurance Guaranty Association, which we have all referred to in short as PIGA." *Id.* at 2.

Judge Wood granted plaintiffs' petition to enforce settlement even though PIGA contended the Guaranty Association Act, which amended similar earlier statutes, allows PIGA a setoff for "any kind of insurance." Judge Wood held:

"The statutory authority governing such claims is set forth in 40 P.S. §§991.1801 through 1820. This statute replaces prior legislation which PIGA and the defendants appear to acknowledge did not allow a setoff for life insurance. Indeed their position is that by rewriting section 17 to refer to any kind of insurance the legislature intended to include life insurance among the appropriate setoffs. Plaintiffs respond by pointing out that at the time

the amendatory statute was adopted, members of our State House of Representatives were assured that the changes in legislation affected other matters, and would *not* 'make it more difficult for a customer to get a refund of his premium or get his claims paid.' " *Id.* at 3.

Judge Wood in discussing the applicable statutory purpose emphasized every insurer is required to join the association and stressed:

"The entire statute appears to address the problems concerned with the insolvency of property and casualty insurance companies, and not with the subject of insurance generally." *Id.* at 3.

Certainly, one of the most serious concerns arises when a private insurer having tendered settlement funds declares bankruptcy and cannot pay those funds. Indeed, the Guaranty Association Act guarantees PIGA's indemnification by the insurer and its insured if the insurer becomes insolvent. Full indemnification is particularly important in circumstances where all parties have agreed upon a final settlement with no foreknowledge of carrier's future bankruptcy. Without such a guarantee, settlement negotiations would be impeded by discussions and calculations of unknowable financial contingencies.

The purpose of the Pennsylvania Property and Casualty Insurance Guaranty Association Act set forth in 40 P.S. §991.1801(1) is:

"To provide a means for the payment of covered claims under certain property and casualty insurance policies, to avoid excessive delay in the payment of such claims and *to avoid financial loss to claimants or policyholders as a result of the insolvency of an insurer.*" (emphasis added)

Either claimant or policyholder could face possible financial loss contrary to the Act's stated purpose if PIGA

were allowed an offset against tendered settlement funds from a solvent insurer. Here, either Auger would have settlement funds contractually bargained for decreased by an unforeseen offset, or Dr. Norwood's personal assets would be risked despite having PIC coverage.

Intervenor, PIGA, agrees PIC's bankruptcy resulted in the Augers having a liquid claim, defined by 40 P.S. §991.1802 as an unpaid claim subject to applicable insurance policy limits issued by an insolvent insurer. (Memorandum of law of PIGA in support of petition to intervene at 2-3.) However, PIGA contends it may deduct an offset pursuant to 40 P.S. §991.1817(a)—Nonduplication of recovery, which states in pertinent part:

"Any person having a claim under an insurance policy shall be required to exhaust first his right under such policy. For purposes of this section, a claim under an insurance policy shall include a claim under any kind of insurance, whether it is a first- or third-party claim, and shall include without limitation, accident and health insurance, workers' compensation, Blue Cross and Blue Shield and all other coverages except for policies of an insolvent insurer. Any amount payable on a covered claim under this Act shall be reduced by the amount of recovery under other insurance."

The statute, however, is silent on what happens to a covered claim settled *prior* to insurer's insolvency, thereby creating rights and corresponding obligations not necessarily subject to ex-post facto application of PIGA's "statutory offset."

Plaintiffs argue the disputed $200,000 constituted a liquidated claim after PIC's August 1997 tender and plaintiffs' release, thereby not includable in its bankruptcy estate, due and payable in full. We agree. The

settlement amount was a sum certain agreed upon by all parties pledged, deposited and encumbered to plaintiffs' benefit on the settlement date. Therefore, it was a liquidated claim capable of exact measurement as defined in *Fifth Mutual Building Society of Manayunk's Appeal*, 317 Pa. 161, 176 A. 494 (1935). Moreover, the party to whom insurance policy limits have been tendered in a civil suit has an "immediate right to the money." *Sun Pipe Line v. Tri-State Telecommunications Inc.*, 440 Pa. Super. 47, 65, 655 A.2d 112, 121 (1994). The Superior Court of Pennsylvania in *Cohen v. Jenkintown Cab Company*, 300 Pa. Super. 528, 536, 446 A.2d 1284, 1288 (1982) in discussing the nature of tender states:

"Money paid into court becomes the absolute property of the other party, *Baldwin Township School District v. Pittsburgh Terminal Coal Corporation*, 328 Pa. 17, 18-19 [194 A. 900] (1937), and the tenderer cannot ordinarily withdraw it or recover any part of it, even if he eventually prevails in the action. 15 Standard Pennsylvania Practice, ch. 74, §24, *Berkheimer v. Geise*, 82 Pa. 64, 67 (1876)."

Defendants' assertion the settlement was not a liquidated claim until the minor's compromise was approved is meritless. Pa.R.C.P. 2039 compromise, settlement, discontinuance, and distribution, provides the court *has a ministerial function in overseeing settlements involving minors to the extent it approves or disapproves disbursement, counsel fees and reasonable expenses.* (emphasis added) It is not a mechanism to undermine or discount a mutually agreed upon settlement. As Pa. R.C.P. 2039(d) states, "Nothing in this rule shall prevent payment into court of any money by the defendant."

Although citations and wording of the Pennsylvania Property and Casualty Insurance Guaranty Association Act have been updated, its stated purpose has not changed since the United States District Court for the Eastern District declared in *T & N PLC v. Pennsylvania Ins. Guar. Ass'n,* 822 F. Supp. 275 (E.D. Pa. 1993):

"Moreover, under the Pennsylvania rules of statutory construction, section 1701.103(5) must be liberally construed to effect its objects and promote justice. 1 Pa.C.S. §1928(c) . . . citations omitted . . . (The legislature requires insurance statutes to be construed liberally in order to effect their purposes.) Therefore, given that a purpose of the Insurance Guaranty Association Act, as noted above, is to protect Pennsylvania residents from financial loss or liability, our construction of 1701.103(5) will effectuate the intent of the General Assembly by ensuring that insured tort-feasors, who reside in Pennsylvania at the time of insured events, are protected from liability imposed in underlying tort action. Cf. *Bullock v. Pariser,* 11 D.&C.3d 77, 81 (Philadelphia County 1979) (the Act must be interpreted to protect insureds who are left exposed to liability due to the insolvency of their insurance carrier as well as injured parties whose attempts at recovery may be frustrated by the insolvency of the tort-feasor's liability carrier), *aff'd,* 311 Pa. Super. 487, 457 A.2d 1287 (1983)."

*T & N PLC v. Pennsylvania Ins. Guar. Ass'n* involved a summary judgment motion against PIGA brought by T & N, a London parent corporation whose Pennsylvania subsidiary, Keasbey, an asbestos manufacturer and distributor, became a party to extensive mass tort and latent disease products liability litigation. T & N entered a settlement agreement with its and Keasbey's insurer,

American Mutual Liability Insurance Company, to cover numerous tort claims brought against Keasbey and T & N as controlling stockholder. Pursuant to the settlement agreement, American Mutual would, in several installments, pay agreed-upon limits of all Keasbey policies as well as T & N's defense costs. When American Mutual failed to honor its obligations under the settlement agreement, T & N argued in its summary judgment motion PIGA should assume American Mutual's obligations. The U.S. District Court granted summary judgment in part, holding PIGA liable for American Mutual's policy limits on a case-by-case basis up to the full agreed settlement amount. *Id.* at 294, 295. The court reasoned:

"Since the insurance policies were extinguished, the settlement agreement, rather than the insurance policies, actually controls the resolution of the issues that will determine PIGA's liability in the instant case. A settlement agreement, like any other contract, is governed by the intent of the parties. However, the settlement agreement provides little guidance on some of these issues. But since the settlement agreement merely represented the amounts due by American Mutual under the insurance policies for T & N's liability in the underlying claims, the terms of the policies will govern these issues."

We believe the U.S. District Court's reasoning is not only sound, but remains good law where settlement was reached creating a liquidated claim prior to PIC's bankruptcy. To hold otherwise is "contrary to Pennsylvania's strong and historical public policy of encouraging good faith settlements." *Id.* at 288. See also, *Walton v. Avco Corp.,* 530 Pa. 568, 581-82, 610 A.2d 454, 461 (1992). Under said circumstances, PIGA must complete its man-

dated purpose to guarantee neither claimants nor policy-holders are left with diminished protection when insurance insolvencies occur.

## CONCLUSION

We hereby hold the entire disputed $200,000 is a liquidated claim immune from statutory offset pursuant to our November 2, 1998 order. Security is to remain in plaintiffs' counsel's escrow fund pending outcome of appellate review.