**T & N PLC, Plaintiff,**

v.

**PENNSYLVANIA INSURANCE GUARANTY ASSOCIATION, Defendant.**

**Civ. A. No. 90–4946.**

United States District Court, E.D. Pennsylvania.

May 26, 1993.

Richard L. Berkman, Philadelphia, PA, Philip L. Graham, Jr., Mark F. Rosenberg, Tariq Mundiya, Esq., New York City, for plaintiff.

Joseph Hankins, Lise Luborsky, Philadelphia PA, for defendant.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

## I. INTRODUCTION

This is an action for statutory benefits under the Pennsylvania Insurance Guaranty Association Act ("Insurance Guaranty Act"), 40 P.S. §§ 1701.101—1701.605 (Purdon 1992). Plaintiff, T & N plc ("T & N"), has filed a three count Complaint against the Defendant, Pennsylvania Insurance Guaranty Association ("PIGA"), which is an unincorporated association of insurers created by statute to provide insolvency insurance for its members. T & N seeks damages against PIGA for its alleged failure to assume the payment obligations of the now insolvent American Mutual Liability Insurance Company ("American Mutual"). Count I of the Complaint is based upon the terms of a Settlement Agreement ("Settlement Agreement") between American Mutual and T & N. This Settlement Agreement resolved insurance coverage claims that arose under various insurance policies issued by American Mutual to the Keasbey & Mattison Company ("Keasbey"), T & N's now dissolved but one-time subsidiary. In Count II of the Complaint, T & N seeks direct recovery under the various insurance policies. Additionally, in Count III, T & N seeks damages for PIGA's alleged bad faith handling of T & N's claims under 42 Pa.Cons.Stat.Ann. § 8371.

On May 29, 1992, we partially granted T & N's Motion for Summary Judgment on Count I of the Complaint and granted PIGA's Motion for Summary Judgment on Count II.

We found that the Settlement Agreement arose out of an insurance policy and that a separate action could not be maintained on the underlying insurance policies. We denied the parties' Motions for Summary Judgment in all other respects with leave to renew when discovery was complete. See *T & N PLC v. Pennsylvania Ins. Guar. Ass'n.*, No. 90–4946, 1992 WL 125554 (E.D.Pa. May 29, 1992). Although discovery was not yet fully complete, we reconsidered our prior ruling with respect to Count III of the Complaint and, by Order of July 9, 1992, granted PIGA leave to file an additional Motion for Summary Judgment with respect to this Count. On August 24, 1992, having found that PIGA is not an insurer for purposes of 42 Pa. Cons.Stat.Ann. § 8371 and that PIGA is immune from bad faith claims under the Insurance Guaranty Act, we granted PIGA's Motion for Summary Judgment on Count III of the Complaint. See *T & N PLC v. Pennsylvania Ins. Guar. Ass'n*, 800 F.Supp. 1259 (E.D.Pa.1992).

The parties have completed discovery and before us now are their Cross–Motions for Summary Judgment on the remaining issues in Count I of the Complaint. Jurisdiction is based upon diversity of citizenship 28 U.S.C. § 1332(a)(2).

## II. FACTUAL BACKGROUND

Keasbey was incorporated in Pennsylvania and had its principal place of business in Ambler, Pennsylvania. Keasbey's business included the manufacture, distribution, and sale of a variety of asbestos-containing products. In 1962, Keasbey sold its assets to a number of different entities and filed for dissolution under Pennsylvania law. The dissolution became final in 1967 when the Pennsylvania Department of State issued a Certificate of Dissolution.

Keasbey was the named insured on standard liability policies issued to it by American Mutual from at least April 1, 1946 through October 1, 1965.[1] These policies

---

1. The actual policies were never located. However, in the underlying coverage action, T & N established the existence of the policies and their terms by secondary evidence. *See Turner & Ne-* *wall, PLC v. American Mut. Liab., Ins. Co.,* No. 82–1339, 1985 WL 8056, at *2 (D.D.C. Aug. 1, 1985).

provided primary coverage for asbestos and other latent disease product liability claims.

T & N is a corporation organized under the laws of England with its principal place of business in Manchester, England. From 1934 to 1938, T & N owned a majority, and from 1938 until Keasbey's dissolution in 1967, it directly or indirectly owned all, of Keasbey's common stock.

Beginning in March of 1978, T & N was sued by thousands of individuals, who alleged that T & N, as the former sole stockholder of Keasbey, was liable for their claims of bodily injury or property damage sustained as a result of asbestos-containing products manufactured by Keasbey. Keasbey was named as an additional party in some of these suits, even though it had been dissolved in 1967. T & N sought coverage for these asbestos cases under Keasbey's insurance policies with American Mutual on the basis of T & N's control or stock ownership of its former subsidiary, Keasbey. American Mutual disputed such coverage.

Consequently, in 1982, T & N filed a declaratory judgment action against American Mutual in the United States District Court for the District of Columbia seeking coverage for these asbestos cases under the insurance policies issued to Keasbey. *Turner & Newall, PLC v. American Mut. Liab., Ins. Co.,* No. 82–1339, 1985 WL 8056 (D.D.C. Aug. 1, 1985). In seven specified asbestos cases, the court entered partial summary judgment in favor of T & N. The court found that as the sole stockholder of Keasbey, T & N was an additional insured under the applicable insurance policies and thereby entitled to coverage. The court further ordered the parties to meet and attempt to agree upon the amount of damages for past costs that T & N was entitled to recover as a result of the court's ruling.

Subsequently, T & N and American Mutual executed a written Settlement Agreement in satisfaction of all T & N's coverage claims against American Mutual under the Keasbey policies, including the seven specified cases in the Declaratory Judgment action. In reaching this Settlement Agreement, the purpose of T & N and American Mutual was "to avoid the continued expense and uncertainty of further protracted litigation, to reimburse T & N for the costs it ha[d] incurred in the defense and settlement of Keasbey cases, and to resolve all of the disagreements and disputes between them by undertaking the terms of this Agreement...." (Complaint Ex. C at 5). The Settlement Agreement recited that T & N had provided American Mutual with proof of $8,500,000 in defense and $12,500,000 in settlement of Keasbey cases. (*Id.*) The Settlement Agreement provided that American Mutual would, in several installments, "pay to T & N the [agreed upon] limits of all Keasbey policies ($10,300,000.00) as well as a portion of T & N's defense costs ($4,177,698.16)." (*Id.* at 7).

The Settlement Agreement further provided, in relevant part, that:

2. This Agreement is intended to confer rights and benefits only upon T & N and AMERICAN MUTUAL, and is not intended to confer any right or benefit upon any other person. No person other than T & N or AMERICAN MUTUAL shall have any legally enforceable right under this Agreement. All rights of action for any breach of this Agreement are hereby reserved to T & N and AMERICAN MUTUAL.

. . . .

5. This Agreement is the entire agreement between T & N and AMERICAN MUTUAL. All antecedent or contemporaneous extrinsic representations and warranties made in the negotiation and preparation of this Agreement are intended to be merged in the agreement and of no further effect.

. . . .

8. Upon execution of this Agreement, AMERICAN MUTUAL shall be considered to have no further duties or obligations based upon, arising out of or related to any policy of insurance issued to Keasbey by AMERICAN MUTUAL and all such policies shall be considered exhausted, null and void and of no further force or effect.

. . . .

15. If, for any reason, an Event of Default occurs, the entire balance due . . .

shall become immediately due and payable. AMERICAN MUTUAL shall pay to T & N interest from the date of the Event of Default calculated at the prime or base rate as announced from time to time by Citibank, N.A., plus one percent, and T & N may exercise all legal and equitable remedies available to it.

(*Id.* at 5–9).

T & N alleges that American Mutual defaulted on its obligations under the Settlement Agreement by failing to pay installments due on January 3, 1989 and January 4, 1990 totalling $5,738,849.08. On or about March 9, 1989, the Massachusetts Supreme Judicial Court adjudged that American Mutual was insolvent, appointed a Permanent Receiver, and ordered that American Mutual be liquidated.

In Count I of this action, T & N seeks the sum of $5,738,849.08 plus interest against PIGA under the Insurance Guaranty Act for its failure to assume the payment obligations of the now insolvent American Mutual under the terms of the Settlement Agreement between T & N and American Mutual.

## III. STANDARD OF REVIEW

The standard for granting summary judgment is well known. Summary Judgment shall be granted "if ... there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of identifying for the court those portions of the record that it believes demonstrate the absence of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). This burden may be discharged by demonstrating that there is an absence of evidence to support the non-moving party's case. *Id.* at 325, 106 S.Ct. at 2554. To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials. *Id.* at 321 n. 3, 106 S.Ct. at 2552 n. 3 (quoting Fed.R.Civ.P. 56(e)). In making such a determination, the appropriate inquiry is whether there is a need for a trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Where the full record, taken together could not lead a rational trier of fact to find for the non-moving party, no genuine issue exists for trial." *United States v. One 107.9 Acre Parcel of Land,* 898 F.2d 396, 398 (3d Cir.1990) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)).

In applying the standard for summary judgment, our analysis is guided by the following well established rules. All justifiable inferences must be drawn in favor of the non-moving party, *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Continental Ins. Co. v. Bodie,* 682 F.2d 436, 438 (3d Cir.1982), all doubts must be resolved against the moving party, *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.) (citations omitted), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985), and all allegations of the non-moving party that conflict with those of the movant must be taken as true. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. at 2513.

## IV. DISCUSSION

PIGA is a statutory entity that depends solely on the Insurance Guaranty Act for its existence and for a definition of the scope of its powers, duties, and protections. PIGA is an involuntary, unincorporated association of insurers admitted to transact business in Pennsylvania. Each insurer is required to participate in PIGA as a condition of doing business in Pennsylvania. 40 P.S. § 1701.-201(a). While the statutory purpose of PIGA is to provide insolvency insurance for each member in order to pay the claims arising out of policies issued by an insurer who becomes insolvent, PIGA's obligations are strictly limited to the payment of "covered claims." 40 P.S. §§ 1701.102, 1701.103(5), 1701.201(b)(1)(i).

There are four distinct requirements that must be satisfied before a claim is "covered" under the Insurance Guaranty Act. *See* 40 P.S. § 1701.103(5). These requirements are set forth within the definition of a "covered

claim." The Insurance Guaranty Act defines a covered claim as follows:

> (5)(a) **"Covered claim"** means an unpaid claim, including a claim for unearned premiums, which arises under a property and casualty insurance policy of an insolvent insurer and is:
>
> > (i) The claim of a person who at the time of the insured event resulting in loss or liability was a resident of this Commonwealth, or
> >
> > (ii) A claim arising from an insured event resulting in loss or liability to property which was permanently situated in this Commonwealth.
>
> (b) A covered claim shall not include any amount due any insurer, reinsurer, insurance pool, or underwriting association, as a subrogation recovery or otherwise.
>
> (c) A covered claim shall not include any amount in excess of the applicable limits of the policy under which it arises.

*Id.*

In granting partial summary judgment on Count I, we found that T & N had satisfied the first requirement. We held that the Settlement Agreement between T & N and American Mutual represents an obligation arising out of the American Mutual insurance policies issued to Keasbey and as such, may well be a "covered claim" under 40 P.S. § 1701.103(5) for which PIGA may be liable. *T & N PLC v. Pennsylvania Ins. Guar. Ass'n,* No. 90–4946, 1992 WL 125554, at *4 (E.D.Pa. May 29, 1992). We found material issues of fact existed with respect to the remaining requirements of a "covered claim," particularly in regard to the residency requirement, and thus we denied both parties' Motions for Summary Judgment on Count I in all other respects with leave to renew when discovery was complete. *Id.* at *5. Having completed discovery, both parties now contend in their Cross–Motions for Summary Judgment that there is no genuine issue of material fact and that each is entitled to judgment as a matter of law on the remaining requirements of a "covered claim" under 40 P.S. § 1701.103(5).

T & N asserts four separate and independent grounds for satisfying the residency requirement under 40 P.S. § 1701.-103(5)(a)(i). T & N contends that (A) Keasbey's Pennsylvania residence should be the relevant residence in determining PIGA's obligations to T & N under the Insurance Guaranty Act; (B) T & N itself should also be treated as a resident of Pennsylvania for purposes of the Insurance Guaranty Act; (C) regardless of its residence as an insured, T & N is entitled to recover from PIGA for the underlying claims of Pennsylvania residents brought against T & N; and (D) apart from the issue of residence, T & N is entitled to reimbursement from PIGA for the underlying claims arising from damage to property permanently located in Pennsylvania.

PIGA maintains that the claim of T & N for the amount due under the terms of the Settlement Agreement is the sole claim covered under the Insurance Guaranty Act. Therefore, PIGA contends that since T & N is not a Pennsylvania resident, it does not have a "covered claim" under 40 P.S. § 1701.103(5).

As a federal court interpreting state law in a diversity action, we must consider and accept the decisions of the state's highest court as the ultimate authority regarding state law. *Ciccarelli v. Carey Canadian Mines, Ltd.,* 757 F.2d 548, 553 (3d Cir.1985); *Connecticut Mut. Life Ins. Co. v. Wyman,* 718 F.2d 63, 65 (3d Cir.1983). When, however, the Pennsylvania Supreme Court has not authoritatively considered the issue, as in the instant case, "our disposition ... must be governed by a prediction of how the state's highest court would decide were it confronted with the problem." *McKenna v. Ortho Pharmaceutical Corp.,* 622 F.2d 657, 661 (3d Cir.), *cert. denied,* 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980); *see also Becker v. Interstate Properties,* 569 F.2d 1203, 1205 (3d Cir.1977), *cert. denied,* 436 U.S. 906, 98 S.Ct. 2237, 56 L.Ed.2d 404 (1978). In this effort, we must give "proper regard" to the relevant rulings of other courts within the state. *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1783, 18 L.Ed.2d 886 (1967); *see also Erie Castings Co. v. Grinding Supply, Inc.,* 736 F.2d 99, 100 (3d Cir.1984).

A review of the background of the Insurance Guaranty Act is helpful. In response to the serious social harm that results from insurance companies becoming insolvent, the National Association of Insurance Commissioners drafted the State Post–Assessment Insurance Guaranty Association Model Bill. *Sands v. Pennsylvania Ins. Guar. Ass'n*, 283 Pa.Super. 217, 221, 423 A.2d 1224, 1225–226 (1980) (citations omitted). A number of states, including Pennsylvania, have enacted guaranty acts that are substantially similar to the Model Bill. *Id.* at 221, 423 A.2d at 1226. The Insurance Guaranty Act, 40 P.S. §§ 1701.101—1701.605 (Purdon 1992), is Pennsylvania's version of the Model Bill. *Id.* Accordingly, in predicting how the Pennsylvania Supreme Court would rule under the Insurance Guaranty Act, we will consider as persuasive authority the relevant rulings of courts interpreting other states' insurance guaranty statutes. *See Pennsylvania Ins. Guar. Ass'n v. Charter Abstract Corp.*, 790 F.Supp. 82, 85 (E.D.Pa.1992) (according appropriate deference to other state courts' interpretations of their guaranty act's residency provisions); *Pennsylvania v. Brown*, 260 F.Supp. 323, 352 (E.D.Pa.1966) (in interpreting statutes similar to or adopted from laws of other states, construction given those statutes by courts of those states are persuasive authority). We turn now to address whether T & N has satisfied the remaining requirements for making out a "covered claim" under the Insurance Guaranty Act.

## A. KEASBEY'S RESIDENCE

■ The parties agree that Keasbey was a resident of Pennsylvania at the time of the insured events under 40 P.S. § 1701.-103(5)(a)(i). They disagree as to whether Keasbey's residence is relevant. T & N contends that Keasbey's Pennsylvania residence should be the relevant residence in determining PIGA's obligations to T & N under the Insurance Guaranty Act. T & N reasons that the term "resident" under 40 P.S. § 1701.103(5)(a)(i) should be interpreted

so that primary responsibility for claims is imposed upon the guaranty association of the jurisdiction in which insurance premiums were paid. Thus, T & N reasons that since the named insured on each policy, Keasbey, paid all of its premiums in Pennsylvania, Keasbey's Pennsylvania residence is the relevant residence for determining PIGA's obligation to T & N under the Insurance Guaranty Act.

In support of this proposition, T & N relies upon *Kroblin Refrigerated Xpress, Inc. v. Iowa Ins. Guar. Ass'n*, 461 N.W.2d 175, 179 (Iowa 1990), where the Iowa Supreme Court held that a corporation's residence was the site of its principal place of business under the Iowa insurance guaranty statute.[2] The court reasoned that the legislature intended a correlation between the payment of claims and the collection of assessments, which are derived from premiums collected on property located in Iowa or from insureds who pay their premiums in Iowa. *Id.* Thus, defining "residence" as the principal place of business, where a corporation was most likely to secure insurance and pay premiums, would effectuate the intent of the legislature by imposing liability upon the guaranty association of the jurisdiction in which insurance premiums were paid. *Id.*

*Kroblin Refrigerated Xpress, Inc. v. Iowa Ins. Guar. Ass'n* stands for the proposition that the residence of a corporate insured, seeking reimbursement for liability sustained in an underlying tort action, should be defined by its principal place of business to ensure that liability is imposed upon the guaranty association of the jurisdiction in which insurance premiums were paid. To suggest, however, that this proposition supports T & N's position, namely that the residence of the named insured (Keasbey), who paid the insurance premiums, should govern which guaranty association is liable for an additional non-resident insured's (T & N) claim of reimbursement for liability sustained in underlying tort actions, is a leap in logic for which we can find no support.

2. Our District Court cited the reasoning of *Kroblin Refrigerated Xpress, Inc. v. Iowa Ins. Guar. Ass'n* with approval in *Pennsylvania Ins. Guar. Ass'n v. Charter Abstract Corp.*, 790 F.Supp. 82, 87 (E.D.Pa.1992), where it was held that a corporation has only one residence for purposes of the Insurance Guaranty Act, but left open the question of whether that residence should be defined as the state of incorporation or principal place of business.

Here, Keasbey's residence is relevant only to the extent it meets the requirements for a covered claim under 40 P.S. § 1701.103(5). T & N argues that Keasbey meets these requirements. The Insurance Guaranty Act provides that a "covered claim" includes "[t]he claim of a person who at the time of the insured event *resulting in loss or liability* was a resident of this Commonwealth...." 40 P.S. § 1701.103(5)(a)(i) (emphasis added). Although Keasbey was named in some of the underlying asbestos actions, T & N does not and cannot assert that Keasbey sustained any actual loss or liability. Having been dissolved in 1967, Keasbey could not have suffered any loss or liability as a result of these actions.[3] Thus, Keasbey never met the requirements for a covered claim under the Insurance Guaranty Act.

When interpreting a Pennsylvania statute, our goal is to ascertain the intent of the General Assembly. *Donegal Mut. Ins. Co. v. Long,* 528 Pa. 295, 300, 597 A.2d 1124, 1127 (1991) (citing 1 Pa.Cons.Stat.Ann. § 1921(a)). In ascertaining that intent with respect to the Insurance Guaranty Act, the Pennsylvania Supreme Court has stated that we may consider the object to be attained by the statute. *Id.* (citing 1 Pa.Cons.Stat.Ann. § 1921(c)(4)).

A stated purpose of the Insurance Guaranty Act is to cover the claims of an insolvent insurer. 40 P.S. §§ 1701.102(1), 1701.201(b)(1)(i). The term "covered claim" is defined, in relevant part, as the unpaid claim of a policyholder or claimant, who at the time of the insured event resulting in loss or liability was a resident of Pennsylvania. 40 P.S. §§ 1701.103(5)(a)(i), 1701.103(8). The intent of the General Assembly is, therefore, to protect Pennsylvania residents from loss or liability associated with insolvent carriers.

In *Beatrice Foods Co. v. Illinois Ins. Guar. Fund,* 122 Ill.App.3d 172, 77 Ill.Dec. 604, 460 N.E.2d 908 (1984), the Appellate Court of Illinois had to decide whether a plaintiff, parent corporation, who voluntarily satisfied a judgment against its subsidiary, had a covered claim under the Illinois insurance guaranty statute.[4] The parent corporation was a resident of Illinois, but the subsidiary was a resident of Indiana. *Id.* at 173, 77 Ill.Dec. at 606, 460 N.E.2d at 910. Both parties were insureds of the insolvent insurer. *Id.* First, the court found that voluntarily satisfying a judgment was not a cognizable loss within the meaning of a covered claim under the Illinois insurance guaranty statute. *Id.* at 174, 77 Ill.Dec. at 607, 460 N.E.2d at 911. The court then ruled that to permit the parent corporation to recover for its non-resident subsidiary's loss would impermissibly circumvent the residency requirement. *Id.* at 174–75, 77 Ill.Dec. at 607, 460 N.E.2d at 911.

Although the inverse of the facts in *Beatrice Foods Co. v. Illinois Ins. Guar. Fund* is presented in the case before us, the reasoning of the Appellate Court of Illinois is fully applicable. In essence, T & N asserts that a non-resident parent corporation should be able to recover its loss or liability under the Insurance Guaranty Act based on the residency of its former subsidiary, which sustained no loss. To permit such a recovery would circumvent the residency requirement and thereby, frustrate the intent of the General Assembly by reimbursing a non-resident of Pennsylvania for its loss. T & N's interpretation of residency under 40 P.S. § 1701.103(5)(a)(i) is, therefore, inconsistent with the Pennsylvania rules of statutory construction. *See* 1 Pa.Cons.Stat.Ann. § 1921(a). Accordingly, we must conclude that Keasbey's Pennsylvania residence is not the relevant

---

**3.** We note that no right of action may be maintained against a company more than two years after the date of its dissolution. 15 P.S. § 2111 (Purdon 1967), *repealed and substantially reenacted by* 15 Pa.Cons.Stat.Ann. § 1979 (1992) (this rule remains the same under present law). Thus, any action brought against Keasbey after 1969 could not have been maintained under the law of Pennsylvania, regardless of whether Keasbey was named as a party.

**4.** The definition of a covered claim under the Illinois insurance guaranty statute is substantially similar to the Pennsylvania Insurance Guaranty Act's definition of a covered claim. *Compare* 40 P.S. § 1701.103(5)(a) *with* Ill.Rev.Stat. ch. 73, para. 1065.84–3 (1979).

residence in determining PIGA's obligations to T & N under the Insurance Guaranty Act.

## B. T & N'S RESIDENCE

■ T & N also contends that the term "resident" should be interpreted flexibly to treat T & N itself as a resident of Pennsylvania under 40 P.S. § 1701.103(5)(a)(i). T & N argues that the flexibility of the term "resident" is inherent in the Insurance Guaranty Act and therefore residence may be defined in a manner to effectuate statutory policy. The Model Bill, upon which, as noted above, the Insurance Guaranty Act is based, indicates that the term "resident" is to be determined by local law and " 'should not necessarily be equated with a [corporation's] domicile.' " *District of Columbia Ins. Guar. Ass'n v. Algernon Blair, Inc.*, 565 A.2d 564, 569 (D.C.1989) (Mack, J., concurring) (citation omitted).

The Insurance Guaranty Act does not define the term "resident." See 40 P.S. § 1701.103. In *Pennsylvania Ins. Guar. Ass'n v. Charter Abstract Corp.*, 790 F.Supp. 82, 85 (E.D.Pa.1992) (Bechtle, C.J.), our District Court found that in using the broad term "resident," the intent of the Pennsylvania General Assembly was to extend benefits under the Insurance Guaranty Act beyond the scope of domestic corporations.[5] Thus, the definition presented a question of statutory construction and that, in such cases, "residency must be determined by the context, purpose, and objective of the statute in which the term is used as well as the extent and character of the business the corporation transacts within the state." *Id.* (citing 17 William M. Fletcher, Fletcher Cyclopedia Corporations § 8301 at 34 (1987); 36 Am. Jur.2d *Foreign Corporations* § 37 at 52 (1968)). *See also Kroblin Refrigerated*

*Xpress, Inc. v. Iowa Ins. Guar. Ass'n*, 461 N.W.2d 175, 177 (Iowa 1990) (residency dependent upon the context, purpose, and objective of the statute in which the term is used); *Eastern Seaboard Pile Driving Corp. v. New Jersey Property–Liability Ins. Guar. Ass'n*, 175 N.J.Super. 589, 592, 421 A.2d 597, 599 (1980) (citations omitted). Hence, the meaning of the term "resident" may vary from statute to statute.

In *Pennsylvania Ins. Guar. Ass'n v. Charter Abstract Corp.*, 790 F.Supp. at 85–87, our District Court considered the context, purpose, and objective of the Insurance Guaranty Act in a thorough analysis of the relevant case law. The court then held that a corporation has only one residence for purposes of the Insurance Guaranty Act, regardless of whether residence is defined as the state of incorporation or principal place of business, that definition provides the sole criterion for determining residence. *Id.* at 87. The court left open the question of whether residence should be defined by either the state of incorporation or the principal place of business because the corporation in *Pennsylvania Ins. Guar. Ass'n v. Charter Abstract Corp.* did not qualify under either test. *Id.*

Here, T & N is a corporation organized under the laws of England with its principal place of business in Manchester, England. Hence, we also do not need to decide whether residence should be defined as either the principal place of business or the state of incorporation as T & N clearly meets neither criterion for residence in Pennsylvania under the Insurance Guaranty Act.

■ Despite the well-reasoned decision in *Pennsylvania Ins. Guar. Ass'n v. Charter Abstract Corp.*,[6] T & N argues that since it has been found to reside in Pennsylvania for

---

5. As a general rule, statutes granting powers, privileges or immunities to "corporations," without any qualifying words, will be construed as applicable only to domestic corporations in the absence of plain indications to the contrary, or unless the legislative intent of the statute shall extend to foreign corporations is clearly expressed in the terms of the statute. *Pennsylvania Ins. Guar. Ass'n v. Charter Abstract Corp.*, 790 F.Supp. 82, 85 (E.D.Pa.1992) (quoting 17 William M. Fletcher, Fletcher Cyclopedia Corporations § 8301 at 34 (1987)).

6. We are disturbed that T & N was apparently aware of the existence of *Pennsylvania Ins. Guar. Ass'n v. Charter Abstract Corp.*, 790 F.Supp. 82 (E.D.Pa.1992), as demonstrated by prior citations and discussion in its Brief, yet T & N not only made no attempt to distinguish this case from the instant action, but also did not even cite this important case in the section of its Brief dealing with these issues.

jurisdictional purposes in litigation concerning the underlying asbestos claims, T & N should also be treated as a resident of Pennsylvania under the Insurance Guaranty Act. T & N cites a number of underlying cases, in which the Pennsylvania courts exercised personal jurisdiction over T & N based on its alleged alter ego relationship with Keasbey, as well as its own contacts with the State. Additionally, T & N relies upon *Freeman v. Northwest Acceptance Corp.*, 754 F.2d 553, 558–59 (5th Cir.1985), in which the Fifth Circuit imputed the citizenship of a subsidiary to its parent and alleged alter ego for purposes of federal diversity jurisdiction.[7] Questions regarding corporate residence, however, may arise in a variety of diverse contexts such as jurisdiction, attachment, taxation, and bankruptcy, and must be treated individually, in connection with the statute in which they arise. *District of Columbia Ins. Guar. Ass'n v. Algernon Blair, Inc.*, 565 A.2d at 570 n. 2 (quoting 17 William M. Fletcher, Fletcher Cyclopedia Corporations § 8300 (perm. ed. 1983)).

T & N offers no relevant [8] explanation of how concepts of residence employed for jurisdictional purposes relate in any way to the interpretation of residency under the Insurance Guaranty Act and we can find no authority to support such a proposition. The context, purposes, and objectives of the Insurance Guaranty Act are vastly different from those underlying personal or federal diversity jurisdiction. While our District Court has found the intent of the General Assembly in using the term "resident" was to extend benefits beyond the scope of domestic corporations, we cannot conceive of any reason or interest the Pennsylvania General Assembly would have in covering the claims of every foreign corporation with sufficient minimum contacts to be amenable to suit in Pennsylvania, or permitting a foreign parent corporation to seek benefits by imputing the Pennsylvania residence of its subsidiary. Other courts that have also addressed the issue of corporate residence under insurance guaranty statutes have uniformly interpreted the term "resident" as meaning either princi-

---

7. T & N's argument raises questions whether diversity jurisdiction is proper in the present case. The general rule in the Third Circuit is to give separate jurisdictional effect to separate corporate entities. *See Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp.*, 461 F.2d 1140, 1142 (3d Cir.1972). " 'Where the corporate separation between a parent and subsidiary, though perhaps merely formal, is real and carefully maintained, the separate place of business of the subsidiary is recognized in determining jurisdiction, even though the parent corporation exerts a high degree of control through ownership or otherwise.' " *Id.* (citations omitted). Nevertheless "where the corporate separation is 'fictitious' or where the subsidiary's business is not distinguishable from the business of the parent and they are acting as one or are in fact one corporate entity, the parent's principal place of business is recognized as the principal place of business of the subsidiary." *Bonar, Inc. v. Schottland*, 631 F.Supp. 990, 997 (E.D.Pa.1986) (citations omitted). Therefore, even if we were to assume the existence of such an alter ego relationship between T & N and Keasbey, T & N is the parent corporation and T & N's English citizenship would remain the same under the rule of *Bonar, Inc. v. Schottland* for purposes of federal diversity jurisdiction.

 *Freeman v. Northwest Acceptance Corp.*, 754 F.2d 553 (5th Cir.1985) is an extension of the rule in *Bonar, Inc. v. Schottland*. The Fifth Circuit's rule of imputing the citizenship of a subsidiary to its parent based on an alter ego relation-

ship for purposes of diversity jurisdiction has not been recognized in the Third Circuit. We believe that the Fifth Circuit's rule is inapplicable to the instant case. First, the rule has no application outside of derivative actions brought against a parent corporation for the conduct of its subsidiary under an alter ego theory of liability in order to further the congressional purpose of denying a federal forum to actions wholly local in character. *See id.* at 558–59. Second, for purposes of ascertaining the existence of diversity jurisdiction, citizenship is determined on the date the complaint is filed. *Gilbert v. David*, 235 U.S. 561, 569, 35 S.Ct. 164, 166, 59 L.Ed. 360 (1914). T & N's subsidiary, Keasbey was dissolved in 1967. In an action where the conduct of the subsidiary is inconsequential to determining liability, we can think of no congressional purpose that would be served by imputing the citizenship of a subsidiary corporation, which was dissolved approximately 23 years before the Complaint was filed. Accordingly, we conclude that federal diversity jurisdiction exists in the instant case.

8. T & N suggests that its obligation to defend against the underlying asbestos actions and its entitlement to insurance coverage has some application to the interpretation of PIGA's liability under the Insurance Guaranty Act. With respect to defining the term "resident" under 40 P.S. § 1701.103(5)(a)(i), we see no correlation between the issues of coverage under an insurance policy and PIGA's obligation under the Insurance Guaranty Act.

pal place of business or state of incorporation, or perhaps both. See *Alabama Ins. Guar. Ass'n v. Colonial Freight Sys., Inc.,* 537 So.2d 475, 476 (Ala.1988); *Kroblin Refrigerated Xpress, Inc. v. Iowa Ins. Guar. Ass'n,* 461 N.W.2d 175, 179 (Iowa 1990); *McMahon v. Louisiana Ins. Guar. Ass'n,* 596 So.2d 1384, 1389 (La.Ct.App.), *cert. denied,* 604 So.2d 970 (La.1992); *Eastern Seaboard Pile Driving Corp. v. New Jersey Property–Liability Ins. Guar. Ass'n,* 175 N.J.Super. 589, 594, 421 A.2d 597, 600 (1980). Accordingly, we are not persuaded by T & N's argument that we should extend the definition of the term "resident" under 40 P.S. § 1701.103(5)(a)(i) based on concepts of residency applied in jurisdictional contexts.

Our conclusion is further supported by the Pennsylvania rules of statutory construction. In ascertaining the intent of the General Assembly with respect to the Insurance Guaranty Act, the Pennsylvania Supreme Court has stated that we may consider the consequences of a particular interpretation. *Donegal Mut. Ins. Co. v. Long,* 528 Pa. 295, 300, 597 A.2d 1124, 1127 (1991) (citing 1 Pa.Cons.Stat.Ann. § 1921(c)(6)). All of PIGA's funds must be obtained by assessment of the member insurers, for purposes of and in amounts sufficient to ensure the payment of covered claims and other expenses authorized by the Insurance Guaranty Act. 40 P.S. § 1701.201(b)(1)(iii). These assessments are derived from premiums collected on property located in Pennsylvania or from insureds who pay their premiums in Pennsylvania. Thus, one consequence of T & N's proposed interpretation would be to drive up insurance premiums to cover the claims of foreign corporations who have little connection with the State. We are quite certain that this result was not intended by the General Assembly.

As a second consequence, T & N's interpretation would render 40 P.S. § 1701.503(b) ineffective and of uncertain application. Section 1701.503(b) provides, in relevant part, that "[a]ny person having a claim which may be recovered under more than one insurance guaranty association or its equivalent shall seek recovery first from the association of the place of residence of the insured...."

Based on this provision, our District Court found, as noted above, that a corporation has only one residence under the Insurance Guaranty Act. *Pennsylvania Ins. Guar. Ass'n v. Charter Abstract Corp.,* 790 F.Supp. 82, 87 (E.D.Pa.1992). If the term "resident" is merely defined in terms of having minimum "jurisdictional type" contacts with a state, a corporation could have more than one residence, if not multiple residences, under the Insurance Guaranty Act. Likewise, imputing the residence of a subsidiary to a parent corporation on the basis of an alter ego relationship would result in a dual residence under the Insurance Guaranty Act. Such a consequence could well render 40 P.S. § 1701.503(b) ineffective and of uncertain application in ascertaining where a person with a claim covered under more than one insurance guaranty association should seek recovery first. In ascertaining legislative intent, there is a presumption that "the General Assembly intends the entire statute to be effective and certain." 1 Pa.Cons.Stat.Ann. § 1922(2); *see also* 1 Pa.Cons.Stat.Ann. § 1921(a) ("Every Statute shall be construed, if possible, to give effect to all its provisions."). We are compelled to find, therefore, that such a consequence was also not intended by the General Assembly.

The goal of all interpretation and construction is to ascertain and effectuate the intention of the General Assembly. 1 Pa.Cons.Stat.Ann. § 1921(a). We must, therefore, reject T & N's proposed interpretation of the term "resident" under 40 P.S. § 1701.-103(5)(a)(i). Accordingly, we conclude that T & N itself is not a resident of Pennsylvania for purposes of the Insurance Guaranty Act.

## C. UNDERLYING CLAIMANTS

T & N also contends that regardless of its residence as an insured, it is entitled to recover from PIGA for the underlying claims of Pennsylvania residents brought against T & N. In clear and unambiguous language, the definition of a "covered claim" under 40 P.S. § 1701.103(5) encompasses claims brought by both holders of a property and casualty insurance policy and claimants under such a policy. 40 P.S. §§ 1701.-103(5)(a)(i), 1701.103(8); *Blackwell v. Penn-*

*sylvania Ins. Guar. Ass'n*, 390 Pa.Super. 31, 34, 567 A.2d 1103, 1105 (1989) (there is no question that a claimant, whose claim against a tortfeasor remains unpaid due to insolvency of the tortfeasor's liability carrier, may have a covered claim under the Insurance Guaranty Act). *See also* 40 P.S. § 1701.102(1) (statutory purpose is to avoid financial loss to *claimants or policyholders* as a result of the insolvency of an insurer); *cf. Connecticut Ins. Guar. Ass'n v. Union Carbide Corp.*, 217 Conn. 371, 585 A.2d 1216, 1220–222 (1991) (references to a "claimant or insured" in the Connecticut insurance guaranty statute indicated that either a claimant or insured may present a covered claim).

Additionally, except for first party claims for damage to property with a permanent location, a person with a claim covered under *more than one* insurance guaranty association or its equivalent, is directed to seek recovery first from the association of the place of residence of the insured. 40 P.S. § 1701.503(b). For this provision to make sense and be effective and certain in application, the Insurance Guaranty Act must be construed to permit a non-resident claimant to rely upon both an insured tortfeasor's residence and right to make a claim. Otherwise, a non-resident claimant could not meet the residency requirements of a "covered claim" under 40 P.S. § 1701.103(5)(a)(i). See 1 Pa.Cons.Stat.Ann. § 1922(2) (The General Assembly intends the entire statute to be effective and certain.).

Moreover, under the Pennsylvania rules of statutory construction, section 1701.103(5) must be liberally construed to effect its objects and to promote justice. 1 Pa.Cons.Stat. Ann. § 1928(c); *see also T & N PLC v. Pennsylvania Ins. Guar. Ass'n*, 800 F.Supp. 1259, 1263 (E.D.Pa.1992) (the act has been broadly construed by courts to effect its purposes) (citing *Matusz v. Safeguard Mutual Ins. Co.*, 340 Pa.Super. 116, 119, 489 A.2d 868, 870 (1985)); *Mattia v. Employers Mut. Co.*, 294 Pa.Super. 577, 582–83, 440 A.2d 616, 618–19 (1982) (The Legislature requires insurance statutes to be construed liberally in

order to effect their purposes.). Therefore, given that a purpose of the Insurance Guaranty Act, as noted above, is to protect Pennsylvania residents from financial loss or liability, our construction of section 1701.103(5) will effectuate the intent of the General Assembly by ensuring that insured tortfeasors, who reside in Pennsylvania at the time of insured events, are protected from liability imposed in underlying tort actions. *Cf. Bullock v. Pariser*, 11 Pa.D. & C.3d 77, 81 (Philadelphia County·1979) (the act must be interpreted to protect insureds who are left exposed·to liability due to the insolvency of their insurance carrier as well as injured parties whose attempts at recovery may be frustrated by the insolvency of the tortfeasor's liability carrier), *aff'd*, 311 Pa.Super. 487, 457 A.2d 1287 (1983).

■ In the present case we are faced with the exact inverse of the above issue, i.e. whether section 1701.103(5) permits a non-resident insured to rely upon the residence and claims of its underlying claimants to meet the residency requirements of a "covered claim." However, our reasoning under 40 P.S. § 1701.103(5)(a)(i) is similar. To comply with 40 P.S. § 1701.503(b), a non-resident insured need not rely on the residence and claims of its underlying claimants as the singular location of the insured's own residence dictates where recovery is first sought.[9] But, since section 1701.503(b) indicates that a "person", which term is defined, in relevant part, as either a policyholder or claimant, see 40 P.S. § 1701.103(8), may have a claim covered under *more than one* insurance guaranty association, the plain language of the Insurance Guaranty Act appears to suggest that a non-resident insured can in some situations rely upon both an underlying claimant's residence and right to make a claim to meet the residency requirements of a "covered claim" under 40 P.S. § 1701.-103(5)(a)(i). Additionally, such a construction also helps effectuate the intent of the General Assembly by ensuring that claimants, residing in Pennsylvania at the time of the insured event, are able to recover their ·

---

9. In the case of a first party claim for damage to property with a permanent location, recovery must be sought first from the insurance guaranty association corresponding to the location of the property. 40 P.S. § 1701.503(b). This case is not presented in the action before us.

damages from the insured in their underlying tort actions.[10]

Of course, underlying claimants, who resided in Pennsylvania at the time of the insured events, could protect themselves if they had brought their own "covered claims" under 40 P.S. § 1701.103(5). However, in cases where an insured is for some reason unable to recover from the insurance guaranty association of its place of residence, the consequences of interpreting section 1701.103(5) to deny a non-resident insured the ability to recover based upon the residence and claims of its underlying claimants, would be unfair. It would also discourage settlements of the underlying actions and, in addition, cause a multiplicity of suits and delays in the payment of losses to Pennsylvania claimants. More specifically, such an interpretation could even encourage a non-resident insured to engage in tactics designed to frustrate the recovery of Pennsylvania claimants in underlying tort actions, so that such claimants would then bring direct actions against PIGA.

We do not believe that the General Assembly intended such consequences and, therefore, decline to adopt such a limited interpretation. See 1 Pa.Cons.Stat.Ann. § 1921(c)(6). First, a statutory purpose of the Insurance Guaranty Act is to avoid delays in the payment of claims. 40 P.S. § 1701.102(1). Encouraging an insured to delay resolution of its underlying actions would undermine this statutory purpose by causing delays in claimants' attempts to recover their losses.[11] Second, discouraging insureds from settling the underlying actions is contrary to Pennsylvania's strong and historical public policy of encouraging good faith settlements.[12] See, e.g., Walton v. Avco Corp., 530 Pa. 568, 581–82, 610 A.2d 454, 461 (1992); Muhammad v. Strassburger, 526 Pa. 541, 548, 587 A.2d 1346, 1349, cert. denied, —— U.S. ——, 112 S.Ct. 196, 116 L.Ed.2d 156 (1991); Brakeman v. Potomac Ins. Co., 472 Pa. 66, 80 n. 3, 371 A.2d 193, 200 n. 3 (1977) (Roberts, J., concurring and dissenting). Accordingly, in the unique situation presented in this case, we believe that section 1701.103(5) permits a non-resident insured to rely upon the residence and claims of its underlying claimants to meet the residency requirements of a "covered claim" under 40 P.S. § 1701.-103(5)(a)(i).[13] Cf. Connecticut Ins. Guar. Ass'n v. Union Carbide Corp., 217 Conn. 371,

10. Our holding is of course limited to situations in which the insured has complied with and failed to recover under section 1701.503(b), which provides, in relevant part, that "[a]ny person having a claim which may be recovered under more than one insurance guaranty association or its equivalent shall seek recovery first from the association of the place of residence of the insured, except [in] a first party claim for damage to property with a permanent location. . . ." 40 P.S. § 1701.503(b).

11. In this situation, after first seeking recovery of a judgment from the insured, a claimant, residing in Pennsylvania at the time of the insured event, would then present a claim to PIGA. The statutory purpose to avoid excessive delay of the payment of claims is well served if the Pennsylvania claimant is able to recoup the loss in the underlying action, rather then having to present a claim to PIGA and further wait to finally recoup such a loss.

12. Settlements are encouraged because they result in early receipt of funds by plaintiffs and reduced volume of litigation. Walton v. Avco Corp., 530 Pa. 568, 581–82, 610 A.2d 454, 461 (1992). The Insurance Guaranty Act similarly favors early receipt of funds by claimants, see 40 P.S. § 1701.102(1), and likewise, PIGA could not

possibly desire an interpretation that would significantly increase the volume of claims brought against it by underlying claimants, as opposed to a single action representing all of the underlying claims. In a time of scarce governmental resources, such a consequence is also contrary to public policy.

13. We recognize that many, if not all, of the underlying claims represented in the obligations in default under the Settlement Agreement, for which T & N is seeking recovery against PIGA, have been paid by T & N to the underlying claimants. However these claims were never paid by American Mutual due to its insolvency. Thus, for purposes of T & N's action for reimbursement against PIGA, these claims remain "unpaid" due to the insolvency of an insurer within the plain meaning of 40 P.S. § 1701.-103(5)(a). Moreover, the consequences of interpreting section 1701.103(5) to deny insureds the ability to recover based on the residence and claims of its underlying claimants when such insureds have previously paid their claims would also discourage settlements of underlying actions and, in addition, cause excessive delays in the payment of losses to Pennsylvania claimants. As noted above, these consequences were not the intent of the General Assembly and, therefore, we decline to adopt such an interpretation.

585 A.2d 1216, 1220–223 (1991) (relying on the claims of the underlying claimants to define the extent of the Connecticut Insurance Guaranty Association's liability for a resident insured's indemnification claim under the Connecticut insurance guaranty statute).

PIGA apparently does not dispute the above conclusions in its Brief, but instead contends that the claims of the underlying claimants are not covered under the Settlement Agreement between T & N and American Mutual and, therefore, their claims are not "covered claims" under 40 P.S. § 1701.103(5). PIGA reasons that in a standard liability policy the insurer agrees "to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person." This coverage provision is found in the standard form policies of American Mutual that were issued to the name insured and T & N's former subsidiary, Keasbey, from at least April 1, 1946 through October 1, 1965.[14] (See Plaintiff's Mem.App. A). Such a provision requires the insurer to make payments on behalf of the insured tortfeasor to underlying liability claimants.

PIGA concludes that for underlying claimants to have "covered claims" under 40 P.S. § 1701.103(5), there must be a valid and existing insurance policy covering the underlying claims. We have previously found that the American Mutual insurance policies were extinguished upon execution of the Settlement Agreement between T & N and American Mutual. *T & N PLC v. Pennsylvania Ins. Guar. Ass'n.*, No. 90–4946, 1992 WL 125554, at *5 (E.D.Pa. May 29, 1992). Thus, T & N's basis for recovery under the Insurance Guaranty Act was reduced to the Settlement Agreement. American Mutual's sole obligation under the Agreement was to pay T & N. (Complaint Ex. C at 5–6). Therefore, after execution of the Agreement, American Mutual had no obligation to directly pay any

of the underlying claims on behalf of its insured, T & N. Hence, PIGA concludes that since the underlying claimants did not have claims covered under the Settlement Agreement, they could not have "covered claims" under 40 P.S. § 1701.103(5) because PIGA's obligations cannot be greater than the insolvent insurer, American Mutual's obligations.

PIGA is correct that its obligations cannot be greater than American Mutual's obligations under the Settlement Agreement. *See* 40 P.S. § 1701.201(b)(1)(i). Since the Settlement Agreement both extinguished the insurance policies and reduced American Mutual's obligation solely to T & N, it eliminated any obligation of American Mutual to pay any of the underlying claims on behalf of T & N. As a result, a claimant could not present a "covered claim" to PIGA upon obtaining a judgment against T & N in an underlying action. *See* 40 P.S. §§ 1701.201(b)(1)(i), 1701.103(5)(a). But, PIGA's argument misses the mark. T & N is bringing this action, not the underlying claimants, and American Mutual is liable to T & N under the Settlement Agreement. When PIGA stepped into the shoes of American Mutual upon its insolvency, PIGA became liable to T & N under the Settlement Agreement to the extent of any "covered claims." *See* 40 P.S. § 1701.201(b)(1)(ii). The issue is, therefore, whether a non-resident insured, T & N, may rely upon the residence and claims of its underlying claimants to meet the residency requirements of a "covered claim" under 40 P.S. § 1701.103(5)(a)(i) when the insurer, American Mutual, had no obligation to directly pay their claims on behalf of T & N after execution of the Settlement Agreement.

Guided by the Pennsylvania rules of statutory construction, which provide that section 1701.103(5) must be liberally construed to effect its objects and to promote justice, see 1 Pa.Cons.Stat.Ann. § 1928(c), we conclude that the Settlement Agreement does not prevent such reliance. As noted above, we have previously held that the Settlement Agree-

---

**14.** These policies provided primary coverage for asbestos and other latent disease product liability claims, including "all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident." (See Plaintiff's Mem.App. A).

ment between T & N and American Mutual represents an obligation arising out of the American Mutual insurance policies issued to Keasbey and as such, may well be a "covered claim" under 40 .P.S. § 1701.103(5) for which PIGA may be liable. *T & N PLC v. Pennsylvania Ins. Guar. Ass'n,* No. 90–4946, 1992 WL 125554, at *4 (E.D.Pa. May 29, 1992). We reasoned that by its very nature and under the terms of the Insurance Guaranty Act, see 40 P.S. § 1701.201(b)(1)(iv), the Settlement Agreement represented such an obligation. *Id.* We further reasoned that the sum owed to T & N under the Settlement Agreement merely represented the amounts due by American Mutual under the insurance policies for T & N's liability in the underlying claims. *Id.* Therefore, permitting T & N to rely on the residence and claims of the underlying claimants represented in the Settlement Agreement, is but a small step and a logical extension of our prior holding. To allow the Settlement Agreement to act as a shield to such reliance would be an unwarranted elevation of form over substance, which has been consistently rejected in other contexts by Pennsylvania courts. *See, e.g., Stein v. Penncrest Constr. Corp.,* 280 Pa.Super. 560, 565, 421 A.2d 1074, 1076 (1980); *Pattinato v. Moody,* 248 Pa.Super. 32, 39, 374 A.2d 1302, 1306 (1977). Moreover, to find otherwise would be contrary to Pennsylvania's strong and historical public policy of encouraging good faith settlements. *See, e.g., Walton v. Avco Corp.,* 530 Pa. 568, 581–82, 610 A.2d 454, 461 (1992); *Muhammad v. Strassburger,* 526 Pa. 541, 548, 587 A.2d 1346, 1349, *cert. denied,* —— U.S. ——, 112 S.Ct. 196, 116 L.Ed.2d 156 (1991); *Brakeman v. Potomac Ins. Co.,* 472 Pa. 66, 80 n. 3, 371 A.2d 193, 200 n. 3 (1977) (Roberts, J.,

concurring and dissenting). It is simply unsound to penalize T & N for settling in good faith.[15] *Cf. Brakeman v. Potomac Ins. Co.,* 472 Pa. at 80 n. 3, 371 A.2d at 200 n. 3.

In a case substantially similar to the action before us, the United States District Court for the District of Montana held that a settlement agreement between an insurer and a claimant arose out of the insurer's obligation under its insurance policy with the insured tortfeasor on the underlying claim and, therefore, was a "covered claim" under the Washington insurance guaranty statute.[16] *See Thornock v. Pack River Management Co.,* 790 F.Supp. 1014, 1015–17 (D.Mont. 1990), *aff'd in part and rev'd in part on other grounds,* 942 F.2d 794 (9th Cir.1991) (text in Westlaw and Lexis) (A settlement agreement by its very nature arises out of an insurance policy and is thus a covered claim.). Additionally, the underlying claimant was a nonresident, who was relying on the residence and claim of the insured to meet the residency requirements of a "covered claim" under the Washington insurance guaranty statute. *See id.* at 1015.

The instant case falls within the parameters of the *Thornock v. Pack River Management Co.* decision. We, therefore, hold as a contractual matter that T & N may rely upon the residence and claims of its underlying claimants to meet the residency requirements of a "covered claim" under 40 P.S. § 1701.103(5)(a)(i) even though American Mutual had no obligation to directly pay their claims on behalf of T & N after execution of the Settlement Agreement. Accordingly, to the extent that T & N can demonstrate that the underlying claims are represented in the amount owed under the Settlement Agreement, that these claimants were Pennsylva-

**15.** PIGA has not challenged the validity of the Settlement Agreement between American Mutual and T & N. See *Brakeman v. Potomac Ins. Co.,* 472 Pa. 66, 81, 371 A.2d 193, 200 (1977) (Roberts, J., concurring and dissenting) (an insurer is not bound by a settlement agreement between an insured and an injured party unless its was made in good faith). Additionally, upon execution of the Settlement Agreement, which extinguished the American Mutual insurance policies, it was expressly agreed that American Mutual could no longer avail itself of a defense based on the insurance policies with respect to the sum due under the Settlement Agreement. Since PIGA

assumed the insolvent, American Mutual's obligations to the extent of any "covered claims" under the Settlement Agreement, see 40 P.S. § 1701.201(b)(1)(ii), PIGA also cannot challenge T & N's claim based on an insurance policy defense.

**16.** The definition of a "covered claim" in the Washington insurance guaranty statute is essentially the same as the Pennsylvania Insurance Guaranty Act's definition. *Compare* 40 P.S. § 1701.103(5)(a) *with* Wash.Rev.Code § 48.32.-030(4) (1989).

nia residents at the time of the insured events, and satisfy the remaining requirements necessary to establish PIGA's liability for a "covered claim" under the Insurance Guaranty Act, PIGA will be obligated to pay T & N.

Apart from issues of residence, the Insurance Guaranty Act provides that "covered claims" shall include claims "arising from an insured event resulting in loss or liability to property which was permanently situated in this Commonwealth." 40 P.S. § 1701.-103(5)(a)(ii). PIGA continues to argue that the claims of the underlying claimants are not covered under the Settlement Agreement between T & N and American Mutual and, therefore, their claims for property damage are also not "covered claims" under 40 P.S. § 1701.103(5). For the reasons stated above, we find that to the extent that T & N can demonstrate that the underlying claims for property damage are represented in the amount owed under the Settlement Agreement, that these claims were for losses to property which was permanently situated in Pennsylvania, and satisfy the remaining requirements necessary to establish PIGA's liability for a "covered claim" under the Insurance Guaranty Act, PIGA will be obligated to pay T & N for these claims as well. We now turn to discuss PIGA's liability for these underlying claims.

## D. PIGA'S LIABILITY

■ PIGA contends alternatively that if the court does find a "covered claim," that any such claim is limited by virtue of the Settlement Agreement to only one claim in the name of T & N. By statute, each "covered claim" is subject to a limit of $299,900. 40 P.S. § 1701.201(b)(1)(i) ($300,000 less the $100 statutory deductible). PIGA reasons, therefore, that T & N's recovery should be limited to $299,900.

In *Connecticut Ins. Guar. Ass'n v. Union Carbide Corp.*, 217 Conn. 371, 585 A.2d 1216, 1220–223 (1991), the Connecticut Insurance Guaranty Association ("CIGA") argued that a covered claim is the claim of an insured for indemnification under a liability policy, not the separate claims of tort victims that gave rise to the claim for indemnification. CIGA contended, therefore, that the insured's recovery was limited to one covered claim per liability policy. *Id.* 585 A.2d at 1220. The Supreme Court of Connecticut rejected this argument and held that the $300,000 limit of the Connecticut insurance guaranty statute applied to *each* of the underlying claims. *Id.* at 1223 (emphasis added). The court noted, however, that any insurance policy limitations which were present, would necessarily define the extent of CIGA's obligation because CIGA's obligation cannot be any greater than that of the insolvent insurer. *Id.* at 1222; *accord Vickodil v. Pennsylvania Ins. Guar. Ass'n*, 356 Pa.Super. 325, 331, 514 A.2d 635, 638 (1986) (The court held that the terms of the insurance policy determined the meaning of "covered claim" in the Insurance Guaranty Act and if the claims were subject to the single person limit under the policy, they are subject to the single $299,900 statutory cap.), *appeal denied*, 514 Pa. 639, 523 A.2d 346 (1987).

We agree with the Supreme Court of Connecticut that if "only an insured may present a covered claim and that such a claim for indemnification from a single occurrence is limited to $300,000, the protection of [state] residents against losses resulting from insolvency of insurance carriers, which the legislature intended to provide, would often prove illusory." *Connecticut Ins. Guar. Ass'n v. Union Carbide Corp.*, 585 A.2d at 1223.

PIGA contends that *Connecticut Ins. Guar. Ass'n v. Union Carbide Corp.* is inapplicable to the present case based on the same argument that the claims of the underlying claimants are not covered under the Settlement Agreement between T & N and American Mutual and, therefore, their claims are not "covered claims" under 40 P.S. § 1701.103(5). Consequently, PIGA argues that the underlying claims may not be considered in determining the number of any "covered claims" subject to the $299,900 statutory limit. For the reasons stated above, we reject this argument. Accordingly, we find that subject to the terms of the underlying insurance policies,[17] the $299,900 limit of

---

**17.** Technically, the meaning of a "covered claim" for purposes of the $299,900 limit under

40 P.S. § 1701.201(b)(1)(i) applies separately to each of the underlying claims represented in the amount owed under the Settlement Agreement.[18]

While T & N has succeeded in establishing many of the major legal points necessary to demonstrate PIGA's liability, it has failed at this point to carry its burden of establishing a record that demonstrates the absence of material fact on all of the issues. T & N's totality approach for determining the facts necessary to ascertain PIGA's liability would require us to draw inferences and resolve doubts in T & N's favor in contravention of the standard of review for summary judgment.[19] Additionally, T & N has not yet analyzed many legal issues essential to ascer-

taining PIGA's liability. To provide a more specific explanation of T & N's failure to fully carry its burden on summary judgment and to provide some guidance to the parties, we will set forth an analytical framework of the legal and factual issues that appear to be necessary to fully ascertain PIGA's liability.

Before addressing the specifics of our analysis, we will discuss the provisions in the Insurance Guaranty Act, which form the basis of our analytical framework, for ascertaining PIGA's liability in T & N's "covered claim." In the present case if T & N's claim is covered by an insurance guaranty association or its equivalent in England, 40 P.S. § 1701.503(b) directs T & N to seek recovery first from such an association.[20] The record

---

40 P.S. § 1701.201(b)(1)(i) is subject to the terms of the Settlement Agreement because the insurance policies were extinguished upon execution of the Settlement Agreement. But since the Settlement Agreement merely represented the amounts due by American Mutual under the insurance policies for T & N's liability in the underlying claims, the terms of the policies will govern the extent of PIGA's obligation for each of the underlying claims represented in the amount owed under the Settlement Agreement.

18. Of course, for the limit to be applicable to the underlying claims, T & N must also demonstrate that the underlying claimants were Pennsylvania residents at the time of the insured events or that these claims were for losses to property which was permanently situated in Pennsylvania, and satisfy the remaining requirements necessary to establish PIGA's liability for a "covered claim" under the Insurance Guaranty Act.

19. T & N provides the following evidence to establish the absence of material fact with respect to its claim for reimbursement for the underlying personal injury claims of persons, who allegedly resided in Pennsylvania at the time of the insured events. T & N alleges that it has been sued in more than 15,000 cases by persons who filed their claims in Pennsylvania courts. Of these cases, 6,600 are closed and 8,547 are pending. In such cases where the residence of the plaintiff was recorded (8,341 claims), approximately 80% of the complaints were commenced by persons, who listed a Pennsylvania residence at the time of filing. Of the cases in which a Pennsylvania residence of the plaintiff was recorded, 1,418 cases are closed and 5,221 are pending. Additionally, in a sample of 1800 complaints filed in Pennsylvania between 1982 to 1992, which included an unspecified number of cases still pending, T & N alleges that approximately 80% of the plaintiffs asserted in their complaints, some of which were verified, that they were residents of Pennsylvania, i.e. at the

time of filing, and that many of the plaintiffs contended that they were exposed to the asbestos products of Keasbey in Pennsylvania.

T & N has paid over $23 million to settle 6,600 of the personal injury claims filed in Pennsylvania, which it argues is an amount substantially in excess of what T & N is seeking from PIGA. In addition, T & N contends that the cost of the 8,547 cases still pending will also exceed the amount at issue here.

In regard to T & N's claim for reimbursement for the underlying claims of losses to property which was permanently situated in Pennsylvania, T & N provides the following evidence. T & N alleges that it has been sued in nine cases, in which the plaintiffs have asserted damage to property permanently located in Pennsylvania. T & N cites as examples *United States v. Nicolet, Inc.*, 712 F.Supp. 1193 (E.D.Pa.1989), in which T & N was sued for contamination caused by Keasbey at its Ambler, Pennsylvania facility, and a case commenced by the Philadelphia School District for property damage to school buildings caused by Keasbey products. T & N asserts that the *United States v. Nicolet, Inc.* was settled for $550,000 plus future remediation costs, likely to amount to $2.6 million, and that it paid 5.45 million, exclusive of defense costs, in the Philadelphia School District case. Additionally, a national class action, in which the Pennsylvania school districts were members of the class, was settled by T & N at a cost of $3 million, exclusive of defense costs. Finally, a case brought by the Trustees of the University of Pennsylvania for damage to property located in Pennsylvania is currently pending.

20. A person with a claim covered under more than one guaranty association may satisfy the requirement of seeking recovery first from the other state's guaranty association, see 40 P.S. § 1701.503(b), by presenting his claim to such a state's association and having the claim reject-

does not indicate whether T & N's claim would be covered by an association in England, but considering that T & N has already attempted to seek recovery from numerous guaranty associations, such a recovery would seem to be an unlikely option. Assuming T & N cannot pursue its claim in England, there is no association of the place of an insured's residence that would be liable for all the underlying claims represented in the amount owed under the Settlement Agreement. It follows, therefore, that each state's association would be liable for its share of such underlying claims to the extent T & N can qualify and demonstrate that either a claimant was a resident of that state at the time of the insured events, or the underlying claim for loss was to property permanently located in that state.[21] See 40 P.S. § 1701.-103(5)(a)(i), (ii). Since each association's share of the liability will necessarily depend on which underlying claims are considered, the underlying claims represented in the amount owed under the Settlement Agreement should probably be ascertained.

▮▮▮▮ PIGA's liability for its share of the underlying Pennsylvania claims in this case must be determined. Although T & N's liability in the numerous underlying claims was settled in one Agreement, PIGA's statutory obligation for each underlying claim was not altered. A "covered claim" cannot "include any amount in excess of the applicable limits of the policy under which it arises." 40 P.S. § 1701.103(5)(c). The settlement amount in the Agreement represented the limits of all Keasbey's insurance policies with American Mutual, plus a portion of T & N's litigation costs in defending the underlying claims. Therefore, with respect to the policy liability represented in the amount owed under the Settlement Agreement, this policy limit provision is satisfied.[22] But to determine PIGA's share of the liability, each underlying claim represented in the amount owed under the Settlement Agreement must be analyzed to determine the extent of American Mutual's liability under the insurance policies. Further, as noted above, subject to the terms of the insurance policies, the $299,-900 limit of 40 P.S. § 1701.201(b)(1)(i) applies to each of the underlying claims represented in the amount owed under the Settlement Agreement.[23] In addition, from at least April 1, 1946 through October 1, 1965, Keasbey's policies with American Mutual had a per occurrence/accident limit of $250,000 per person and a $500,000 limit per accident. Therefore, a portion of PIGA's share of the liability may not be recoverable depending on an interpretation of the insurance policies.[24]

ed—such a person does not need a final adjudication of the claim. McMahon v. Caravan Refrigerated Cargo, Inc., 406 Pa.Super. 303, 307, 594 A.2d 349, 351, appeal denied, 529 Pa. 621, 600 A.2d 538 (1991).

21. Although recovery in other states will depend on their particular insurance guaranty statutes, 48 states have enacted guaranty statutes substantially similar to the Insurance Guaranty Act. Of course, our decision only affects the rights of the parties to this suit, T & N would need to satisfy the remaining requirements of each state for a "covered claim."

22. Additionally, 40 P.S. § 1701.103(5)(b) requires that a "covered claim shall not include any amount due any insurer, reinsurer, insurance pool, or underwriting association, as a subrogation recovery or otherwise." Since the amounts claimed by T & N do not constitute subrogation recoveries or amounts due an insurer, this requirement is also satisfied.

23. In Vickodil v. Pennsylvania Ins. Guar. Ass'n, 356 Pa.Super. 325, 331, 514 A.2d 635, 638 (1986), appeal denied, 514 Pa. 639, 523 A.2d 346 (1987), the Pennsylvania Superior Court held

that the terms of the policy determined the meaning of "covered claim" in the Insurance Guaranty Act and if the claims were subject to the single person limit under the policy, they are subject to the single $299,900 statutory cap. Whether any of the relevant underlying claims in the instant case would be grouped similarly for purposes of the statutory cap depends on an interpretation of the insurance policies.

24. The General Assembly did not intend that the Insurance Guaranty Act would return all claimants to the same position they would have occupied had their insurer remained solvent. Even with the existence of PIGA, the General Assembly anticipated that some claimants and insureds would suffer some amount of financial loss due to the insolvency of an insurer, because of PIGA's obligation is limited to $299,900. Blackwell v. Pennsylvania Ins. Guar. Ass'n, 390 Pa.Super. 31, 37, 567 A.2d 1103, 1106 (1989) (citing 40 P.S. § 1701.201(b)(1)(i)). Indeed, regardless of whether the $300,000 cap or the insurance policy limit controls the upper limit of PIGA's liability for any one "covered claim," PIGA's obligation in each "covered claim" must be reduced by the $100 statutory deductible. See 40

Since the insurance policies were extinguished, the Settlement Agreement, rather than the insurance policies, actually controls the resolution of the issues that will determine PIGA's liability in the instant case. A settlement agreement, like any contract, is governed by the intent of the parties. However, the Settlement Agreement provides little guidance on some of these issues. But since the Settlement Agreement merely represented the amounts due by American Mutual under the insurance policies for T & N's liability in the underlying claims, the terms of the policies will govern these issues.

Keeping these principles in mind, we turn to the specifics of the analytical framework. The defense litigation costs in the settlement amount represented only a portion of T & N's total defense costs for the underlying claims. As a result, we can see no workable means by which to properly account for these costs in the individual analysis of each underlying claim. If the actual costs directly attributable to each underlying claim were considered in the analysis, each state association's share of the liability could be impermissibly varied. Initially, therefore, we believe the defense costs represented in

the amount owed under the Settlement Agreement should be determined and separated from the total amount owed in order to ascertain both the policy liability that has been paid and that which is represented in the amount owed under the Settlement Agreement.[25]

The next step is to determine the underlying claims represented in the amount owed under the Settlement Agreement in order to accurately calculate PIGA's share of the liability. A "covered claim" does not include the claims actually paid by the insolvent insurer. 40 P.S. § 1701.103(5)(a). The underlying claims represented in the amount that was paid in the Settlement Agreement must, therefore, be identified in order to ascertain the relevant claims represented in the amount which was not paid and is owed under the Settlement Agreement. To accomplish this, the order in which the claims would have been paid by American Mutual must be determined.[26] Then each underlying claim represented in the Settlement Agreement must be evaluated in this payment order to determine the policy liability amount American Mutual would have been liable for under the insurance policies.[27] This process must be repeated, claim after

P.S. § 1701.201(b)(1)(i). Therefore, a portion of PIGA's share of the liability is definitely not recoverable.

**25.** This issue will turn on how policy liability and defense costs were apportioned in each of the paid installments under the Settlement Agreement. For clarification purposes, we have assumed that each installment included a proportionate amount of policy liability and defense costs relative to the respective totals of $10,300,-000 and $4,177,698 settled upon, so that approximately 29% of the amount owed under the Settlement Agreement represented defense costs. Thus, of the $5,738,849 T & N is seeking for the two unpaid installments, we will assume $1,664,-266 represents defense costs and $4,074,583 represents policy liability. We will also assume, therefore, that $6,225,417 of policy liability was paid by American Mutual under the Settlement Agreement.

**26.** This issue will turn on an interpretation of the insurance policies.

**27.** Of course, for an underlying claim to be represented in the Settlement Agreement, such a claim must have been covered under the insur-

ance policies. In personal injury cases involving asbestos diseases, the Pennsylvania Superior Court has ruled that the entire process from exposure to manifestation constitutes an injury triggering insurance coverage. *J.H. France Refractories Co. v. Allstate Ins. Co.*, 396 Pa.Super. 185, 203, 578 A.2d 468, 477 (1990), *appeal granted*, 527 Pa. 634, 592 A.2d 1302 (1991); *see also AC and S, Inc. v. Aetna Casualty and Sur. Co.*, 764 F.2d 968, 973 (3d Cir.1985) (reaching same conclusion). Although the entire process triggers insurance coverage, the event triggering coverage must occur during the effective period of a policy for the claim to be covered. *See J.H. France Refractories Co. v. Allstate Ins. Co.*, 396 Pa.Super. at 201–02, 578 A.2d at 476. Accordingly, for the underlying personal injury claims to be covered under the Keasbey insurance policies, such claimants must have sustained their injuries at a time when at least one of the insurance policies was in effect. Likewise, for the underlying property damage claims to be covered, the injury or damage to property must have occurred during the effective period of the insurance policies. Once again, the terms of the insurance policies will govern the extent American Mutual would have been liable for in each claim covered under the insurance policies.

claim, until the total amount of American Mutual policy liability reaches the amount of policy liability represented in the Settlement Agreement that was actually paid.[28]

Once the paid amount of policy liability represented in the Settlement Agreement is exhausted, the next underlying claim will mark the beginning of those claims represented in the amount unpaid and owed under the Settlement Agreement. Continuing in the order determined above, each of these underlying claims should also be evaluated to determine the policy liability amount American Mutual would have been liable for under the insurance policies. Then, each underlying claim must be analyzed to determine if either (1) the claimant was a resident of Pennsylvania at the time of the insured events, or (2) the claim was for a loss to property permanently situated in Pennsylvania within the meaning of 40 P.S. § 1701.-103(5)(a)(i), (ii).[29] If so, the next step is to determine PIGA's statutory obligation in the underlying claim under 40 P.S. § 1701.-201(b)(1)(i).[30] This process must be repeated, claim after claim, until the total amount of American Mutual policy liability reaches the policy liability represented in the amount owed under the Settlement Agreement.[31] Finally, PIGA's total obligation for policy liability represented in the amount owed under the Settlement Agreement may be calculated.

Having earlier determined the defense costs represented in the amount owed under the Settlement Agreement, PIGA's share of these costs must be ascertained to calculate PIGA's total obligation for policy liability and defense costs. As noted above, since only a portion of the defense costs are represented in the Settlement Agreement, there is no way to account for these costs accurately in the analysis of each underlying claim. We find, therefore, that PIGA's liability for these costs must be prorated.[32] *Cf. J.H. France*

---

**28.** Based on our prior assumption that $6,225,-417 represented the policy liability paid by American Mutual, the underlying claims must be analyzed in the appropriate order until the total of American Mutual's policy liability on these claims reaches this amount.

**29.** 40 P.S. § 1701.103(5)(a)(i) provides that a "covered claim" includes the claim of a person who was a *resident of Pennsylvania at the time of the insured event.* For purposes of personal injury cases involving asbestos diseases, an insured event means the entire disease process from exposure to manifestation. *J.H. France Refractories Co. v. Allstate Ins. Co.*, 396 Pa.Super. 185, 203, 578 A.2d 468, 477 (1990), *appeal granted*, 527 Pa. 634, 592 A.2d 1302 (1991); *see also AC and S, Inc. v. Aetna Casualty and Sur. Co.*, 764 F.2d 968, 973 (3d Cir.1985) (reaching same conclusion). We have found that (1) for the underlying personal injury claims to be represented in the Settlement Agreement, they must be covered under the Keasbey insurance policies, and (2) to be covered under the insurance policies, such claimants must have sustained their injuries (i.e. exposure to manifestation) at a time when at least one of the insurance policies was in effect. It follows then that to satisfy the residency requirement of section 1701.103(5)(a)(i), the claimants must have been residents of Pennsylvania at some time between their exposure to asbestos and manifestation of their asbestos-related diseases and a Keasbey policy must have been in effect at the time of the triggering event. In a situation where a claimant's residency changes during the period of exposure to asbestos and manifestation of the asbestos-related disease while the insurance policies were in effect,

PIGA's liability must be prorated based on the proportionate share of time that such a claimant was a resident of Pennsylvania during the period of exposure to manifestation. *Cf. J.H. France Refractories Co. v. Allstate Ins. Co.*, 396 Pa.Super. at 208, 578 A.2d at 479–80 (prorating liability in asbestos cases amongst many insurers based on the amount of time their policies were in effect during the period of exposure to manifestation).

**30.** As we noted earlier, a portion of PIGA's share of the liability may not be recoverable depending on an interpretation of the insurance policies relative to the $299,900 statutory limit. In any event, as we explained above, PIGA's liability for each "covered claim" must be reduced by the $100 statutory deductible.

**31.** Based on our prior assumption that $4,074,-583 represented the unpaid amount of policy liability represented in the Settlement Agreement, the underlying claims must continue to be analyzed in the appropriate order until the total of American Mutual's policy liability on these claims reaches this amount.

**32.** Since this analysis does not calculate the total obligations of all the state associations for the policy liability represented in the amount owed under the Settlement Agreement, PIGA's proportionate share of the defense costs must be based upon the ratio of the amount of unpaid policy liability obligations of American Mutual that are covered under the Pennsylvania Insurance Guaranty Act relative to the overall amount of policy liability represented in the amount owed under the Settlement Agreement.

*Refractories Co. v. Allstate Ins. Co.*, 396 Pa.Super. 185, 208, 578 A.2d 468, 479–80 (1990) (adopting proration as a method to calculate liability of each insurer for asbestos-related injuries), *appeal granted,* 527 Pa. 634, 592 A.2d 1302 (1991).

 While defense costs are recoverable under the Insurance Guaranty Act, a "covered claim" does not include these costs to the extent they exceed PIGA's statutory obligation.[33] *See Matusz v. Safeguard Mut. Ins. Co.*, 340 Pa.Super. 116, 119–20, 489 A.2d 868, 870 (1985). Unfortunately then, as part of the analysis of the underlying claims represented in the amount owed under the Settlement Agreement, the amount of actual total defense costs associated with each of these underlying claims will also have to be determined. To the extent the actual costs in each underlying claim exceed PIGA's statutory obligation, they will have to be negated in calculating the total amount of these costs. Then, the total amount must be compared to the prorated amount calculated above. The smaller of the two amounts will determine PIGA's obligation for the defense costs represented in the amount owed under the Settlement Agreement. This procedure will ensure that PIGA does not pay more than its statutory obligation under the Insurance Guaranty Act.

## V. CONCLUSION

We recognize that our suggested analysis of the legal and factual issues necessary to ascertain PIGA's liability places a heavy burden on T & N. We would much prefer a simpler solution. However, we cannot permit PIGA's statutory obligation for a "covered claim" to be altered merely because the Settlement Agreement encompasses a large number of underlying asbestos claims.

T & N has succeeded in establishing many legal points necessary to demonstrate PIGA's liability, but has otherwise failed to carry its burden on summary judgment.

PIGA has also succeeded in establishing some legal points, but the pertinent arguments of PIGA must fail as a matter of law. Accordingly, both parties' Motions for Summary Judgment must be granted in part and denied in part.

An appropriate order follows.

## ORDER

AND NOW, this 26th day of May, 1993, upon consideration of the Plaintiff, T & N PLC's ("T & N") Motion for Summary Judgment, filed on October 27, 1992, the Defendant, Pennsylvania Insurance Guaranty Association's ("PIGA") Cross–Motion for Summary Judgment, filed on October 27, 1992, the parties' Responses and Replies thereto, it is hereby **OREDERED** consistent with the foregoing Opinion that:

1. T & N's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART** without prejudice; and

2. PIGA's Cross–Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART** without prejudice.

In consideration of our disposition in the above matters, it is further **ORDERED** that the discovery deadline is extended 120 days from the date of this Order and that all of the parties shall meet with Magistrate Judge Rapoport within 30 days from the date of this Order to discuss settlement of this case.

---

**33.** Defense costs may not exceed the policy limits because a "covered claim" does not include any amounts in excess of the applicable limits of the policy under which it arises. 40 P.S. § 1701.-103(5)(c); *see also Sands v. Pennsylvania Ins. Guar. Ass'n,* 283 Pa.Super. 217, 228, 423 A.2d 1224, 1229 (1980). Additionally, in a case where the $299,900 statutory cap of 40 P.S. § 1701.-201(b)(1)(i) dictates the limit of PIGA's liability, defense costs could not exceed the statutory cap. *See* 40 P.S. § 1701.201(b)(1)(i).